Elizabeth KARLIN, M.D.; Planned Parenthood of Wisconsin, Inc.; Gary T. Prohaska, M.D.; Dennis D. Christensen M.D.; and Summit Women's Health Organization, on behalf of themselves and their patients seeking abortions, Plaintiffs,

v.

C. William FOUST, in his official capacity as district attorney for Dane County and a representative of the class of all district attorneys in Wisconsin; James E. Doyle, in his official capacity as Attorney General of Wisconsin; E. Michael McCann, in his official capacity as district attorney for Milwaukee County; James Chambers, Michael Mehr, B. Ann Nevaiser, James Esswein, Rudolfo Molina, W.R. Schwartz, Mikki Patterson, Sidney Johnson, Sandra Makhorn, Pablo Pedraza, Glenn Hoberg, Wanda Roever, Ronald Grossman, and Darold Treffert, in their official capacities as members of the Wisconsin Medical Examining Board; Elaine August, Timothy D. Burns, Bonnie M. Creighton, Ruth E. Lindgren, Pamela A. Maxon, Lorraine A. Norem, Roberta P. Overby, McArthur Weddle, and Ann Brewer, in their official capacities as members of the Wisconsin Board of Nursing; Muriel Harper, Virginia Heinemann, Cornelia Hempe, Douglas Knight, and Anita Kropf, in their official capacities as members of the social worker section of the Wisconsin Examining Board of Social Workers, Marriage and Family Therapists and Professional Counselors; Joseph Leean, in his official capacity as

Secretary of the Wisconsin Department of Health and Family Services; and K.B. Piper, in his official capacity as Administrator of the Division of Health of the Wisconsin Department of Health and Family Services, Defendants.

No. 96–C–0374–C.

United States District Court, W.D. Wisconsin.

June 19, 1997.

As Amended June 20, 1997.

Opinion Clarifying Decision Oct. 2, 1997.

Simon Heller, New York City, for Elizabeth Karlin, M.D., Planned Parenthood of WI, Inc., Gary T. Prohaska, M.D., Dennis D. Christensen, M.D., Summit Women's Health.

Bruce Olsen, Asst. Atty. Gen., Madison, WI, for C. William Foust, James E. Doyle, James Chambers, Michael Mehr, B. Ann Nevaiser, James Esswein, Rudolfo Molina, W. R. Schwartz, Mikki Patterson, Sidney Johnson, Sandra Makhorn, Pablo Pedraza, Glenn Hoberg, Wanda Roever, Ronald Grossman, Darold Treffert, Elaine August, Timothy D. Burns, Bonnie M. Creighton, Ruth E. Lindgren, Pamela A. Maxon, Lorraine A. Norem, Roberta P. Overby, McArthur Weddle, Ann Brewer, Muriel Harper, Virginia Heinemann, Cornelia Hempe, Douglas Knight, Anita Kropf, Joseph Leean, K.B. Piper.

E. Michael McCann, Milwaukee County Dist. Atty., Milwaukee, WI, for E. Michael McCann.

## OPINION AND ORDER

CRABB, District Judge.

The state of Wisconsin has enacted a law that requires physicians who provide abortions to give their patients specific oral and printed information at least 24 hours before performing an abortion. The question this case raises is whether the new law will make it so difficult for women in Wisconsin to exercise their constitutionally protected rights to obtain abortions as to constitute an "undue burden" as articulated in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992). Although the law intrudes upon the pregnant woman's constitutional liberty "to decide matters of the highest privacy and the most personal nature," *id.* at 915, 112 S.Ct. at 2840 (Stevens, J., concurring in part and dissenting in part), by "inject[ing] into a woman's most personal deliberations [the state's] own views of what is best," *id.* at 916, 112 S.Ct. at 2840, the Supreme Court's holding in *Casey* requires the conclusion that the majority of Wisconsin's law is constitutional because most of the restrictions it imposes do not constitute undue burdens upon a woman's right to choose whether to continue or terminate her pregnancy.

### HISTORY OF THIS CASE

On May 1, 1996, the day after the governor signed into law Assembly Bill 441, a law regulating the process by which physicians obtain the voluntary and informed consent of their patients seeking abortions, plaintiffs Elizabeth Karlin, M.D., Planned Parenthood of Wisconsin, Inc., Gary Prohaska, M.D., Dennis Christensen, M.D., and Summit Women's Health Organization filed this civil action, asserting that AB 441 violates a number of rights guaranteed to them and to their patients by the United States Constitution. Plaintiffs added a request for a temporary restraining order and a preliminary injunction enjoining defendants from enforcing AB 441. Their request for a temporary restraining order was granted after a hearing held on May 6 and extended by agreement of the parties until a decision could be reached on plaintiffs' motion for a preliminary injunction, which was converted to a motion for permanent injunction and heard in October 1996.

AB 441 enacts a number of changes to the Wisconsin laws pertaining to informed consent procedures for abortion and it repeals and recreates the primary statute governing this topic, Wis. Stat. § 253.10.

### A. *Old § 253.10*

Under the prior statute governing informed consent for abortions, Wis. Stat. § 253.10 (repealed 1996), the attending physician or a person assisting that physician had to verbally provide a woman seeking to obtain an abortion the following information: 1) whether she was pregnant; 2) the probable gestational age of the fetus; 3) the availability of public and private agencies and

services offering birth control information and assistance if the woman chose not to have an abortion; 4) special guidance for minors seeking abortions if the woman was a minor; and 5) any particular risks associated with the woman's pregnancy and the abortion technique to be employed. § 253.10(1)(a). The attending physician or assistant had the option of informing women about the probable physical characteristics of the fetus at the time the abortion was to be performed. § 253.10(1)(c). If a woman requested information about the public and private agencies offering birth control information and assistance with pregnancy and childbirth, physicians and their assistants were required to provide this information. § 253.10(2). County departments in counties where abortions were provided were responsible for compiling the information and distributing it to abortion providers. Wis. Stat. § 46.245 (repealed 1996). (As with § 253.10, AB 441 repealed and recreated § 46.245). Before undergoing the abortion procedure, a woman had to sign a statement acknowledging that she had received the required oral information, been given the opportunity to receive the written information and consented freely and without coercion to the abortion. § 253.10(3). Gathering of informed consent was unnecessary if an emergency abortion was required because of an immediate threat and a grave risk to the life and health of the woman. § 253.10(4).

### B. *New § 253.10*

The new Wis. Stat. § 253.10 (1996) enacted by AB 441 makes a number of changes in the basic informed consent structure in place under the prior law. The statute is divided into eight sections: 1) legislative findings and intent; 2) definitions; 3) voluntary and informed consent; 4) hotline; 5) penalty; 6) civil remedies; 7) affirmative defense; and 8) construction.

### 1. *Legislative findings and intent— § 253.10(1)*

In subsection (1), the legislature set forth its reasons for modifying informed consent procedures for abortion. Essentially, the legislature determined that many women seeking abortions do not have full knowledge of the medical and psychological risks of abortion and need more extensive information in order to make an informed choice; most women receiving elective abortions do not have a prior patient-physician relationship with the doctor providing the abortion and lack an opportunity to receive personal counseling from that doctor about their decision; and a reasonable waiting period is necessary to ensure that women have a full opportunity to give their voluntary and informed consent before electing to undergo an abortion.

### 2. *Definitions—§ 253.10(2)*

In subsection (2), the legislature defined a number of terms. Those relevant to this case are the following:

(a) "Abortion" means the use of an instrument, medicine, drug or other substance or device with intent to terminate the pregnancy of a woman known to be pregnant or for whom there is reason to believe that she may be pregnant and with intent other than to increase the probability of a live birth, to preserve the life or health of the infant after live birth or to remove a dead fetus.

(d) "Medical emergency" means a condition, in a physician's reasonable medical judgment, that so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a 24–hour delay in performance or inducement of an abortion will create serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions.

(f) "Qualified person assisting the physician" means a social worker certified under ch. 457, a registered nurse or a physician assistant to whom a physician who is to perform or induce an abortion has delegated the responsibility, as the physician's agent, for providing the information required under sub. (3)(c)2.

(g) "Qualified physician" means a physician who by training or experience is qualified to provide the information required under sub. (3)(c)1.

### 3. *Voluntary and informed consent—§ 253.10(3)*

Section 253.10(3) sets up the overarching structure of the new informed consent provisions. It provides that an abortion may not be performed unless the woman has given voluntary and informed written consent to the procedure. § 253.10(3)(a). Consent is *voluntary* only if it is given "freely and without coercion by any person." § 253.10(3)(b). Unless a medical emergency exists, consent is *informed* only if all of the following take place:

1. Except as provided in sub. (3m), at least 24 hours before the abortion is to be performed or induced, the physician who is to perform or induce the abortion or any other qualified physician has, in person, orally informed the woman of all of the following:

a. Whether or not, according to the reasonable medical judgment of the physician, the woman is pregnant.

b. The probable gestational age of the unborn child at the time that the information is provided. The physician or other qualified physician shall also provide this information to the woman in writing at this time.

c. The particular medical risks, if any, associated with the woman's pregnancy.

d. The probable anatomical and physiological characteristics of the woman's unborn child at the time the information is given.

e. The details of the medical or surgical method that would be used in performing or inducing the abortion.

f. The medical risks associated with the particular abortion procedure that would be used, including the risks of infection, psychological trauma, hemorrhage, endometritis, perforated uterus, incomplete abortion, failed abortion, danger to subsequent pregnancies and infertility.

g. That fetal ultrasound imaging and auscultation of fetal heart tone services are available that enable a pregnant woman to view the image or hear the heartbeat of her unborn child. In so informing the woman and describing these services, the physician shall advise the woman as to how she may obtain these services if she desires to do so.

h. The recommended general medical instructions for the woman to follow after an abortion to enhance her safe recovery and the name and telephone number of a physician to call if complications arise after the abortion.

i. If, in the reasonable medical judgment of the physician, the woman's unborn child has reached viability, that the physician who is to perform or induce the abortion is required to take all steps necessary under s. 940.15 to preserve and maintain the life and health of the child.

j. Any other information that a reasonable patient would consider material and relevant to a decision of whether or not to carry a child to birth or to undergo an abortion.

k. That the woman may withdraw her consent to have an abortion at any time before the abortion is performed or induced.

L [sic]. That, except as provided in sub. (3m), the woman is not required to pay any amount for performance or inducement of the abortion until at least 24 hours have elapsed after the requirements of this paragraph are met.

§ 253.10(3)(c)1. In addition, a woman's consent is not informed unless "the physician who is to perform or induce the abortion, a qualified person assisting the physician or another qualified physician has, in person, orally informed the woman of all of the following:

a. That benefits under the medical assistance program may be available for prenatal care, childbirth and neonatal care.

b. That the father of the unborn child is liable for assistance in the support of the woman's child, if born, even if the father has offered to pay for the abortion.

c. That the woman has a legal right to continue her pregnancy and to keep the child, place the child in foster care, place the child with a relative for adoption or petition the court for placement of the

child for adoption in the home of a person who is not a relative.

d. That the woman has the right to receive and review the printed materials described in par. (d). The physician or qualified person assisting the physician shall physically give the materials to the woman and shall, in person, orally inform her that the materials are free of charge, have been provided by the state and describe the unborn child and list agencies that offer alternatives to abortion and shall provide her with the current updated copies of the printed materials free of charge.

e. If the woman has received a diagnosis of disability for her unborn child, that the printed materials described in par. (d) contain information on community-based services and financial assistance programs for children with disabilities and their families, information on support groups for people with disabilities and parents of children with disabilities and information on adoption of children with special needs.

f. If the woman asserts that her pregnancy is the result of sexual assault or incest, that the printed materials described in par. (d) contain information on counseling services and support groups for victims of sexual assault and incest and legal protections available to the woman and her child if she wishes to oppose establishment of paternity or to terminate the father's parental rights.

g. The availability of public and private agencies and services to provide the woman with birth control information, including natural family planning information."

§ 253.10(3)(c)2. This second category of information may be provided by a "qualified person assisting the physician," whereas the first items may be given only by the abortion physician or any other qualified physician. Both sets of information must be provided "in an individual setting that protects [a woman's] privacy, maintains the confidentiality of her decision and ensures that the information she receives focuses on her individual circumstances." § 253.10(3)(c)3. A family member or any other person of the woman's choice may be present during her private counseling. *Id.* The person providing the

information must provide adequate opportunity for the woman to ask questions. § 253.10(3)(c)4.

The person providing the second category of oral information must also "physically give" the woman certain printed materials. § 253.10(3)(c)2.d. These materials are to be developed by the state Department of Health and Social Services and distributed to county departments in counties where abortions are performed. § 253.10(3)(d). Abortion providers must obtain a reasonable number of these materials from the county department in their county. § 46.245(1); § 253.10(3)(e). Section 253.10(3)(d) directs the department to include the following in these printed materials: geographically indexed materials informing a woman about public and private agencies that offer ultrasound imaging, help for fetuses diagnosed with a disability, help to women pregnant as a result of incest or sexual assault; information about governmentally funded programs serving pregnant women; photographs, pictures or drawings containing objective and accurate information designed to inform the woman of the probable anatomical and physiological characteristics of the unborn child at different stages of gestation; and the medical and psychological risks associated with each common abortion procedure. If after receiving the state-printed materials, a woman asks to receive a list of public and private agencies and services that will offer her birth control information, these materials must be provided to her. § 253.10(3)(cm). (County departments in counties where abortions are performed are responsible for compiling these lists and distributing them to known abortion providers in that county. § 46.245(2)). Abortion providers "may" be charged a fee for both the state-printed and the county department-compiled materials, as long as the fee does not exceed the actual cost of preparation and distribution of the materials. § 253.10(3)(d); § 46.245(1).

Prior to an abortion, a woman must certify in writing on a form provided by the state that she has been furnished with both sets of oral information, that she has been given the written information described in § 253.10(3)(d) and that all of her questions

have been answered in a satisfactory manner. § 253.10(3)(c)5. The physician performing the abortion or her qualified assistant must receive the signed form before performing the abortion, must place it in the woman's medical record and must give the woman a copy of the form. § 253.10(3)(c)6. If the physician who is to perform the abortion determines that a medical emergency exists, the physician must inform the woman, if possible, of the medical indications of the emergency condition and, if possible, obtain the woman's written consent prior to the abortion. § 253.10(3)(f). If all the informational requirements of § 253.10(3)(c) are met, there is a rebuttable presumption that the woman's consent is informed. § 253.10(3)(g). However,

> The presumption of informed consent may be overcome by a preponderance of the evidence that establishes that the consent was obtained through fraud, negligence, deception, misrepresentation or omission of a material fact. There is no presumption that consent to an abortion is voluntary.

*Id.*

A woman who alleges that she is pregnant as a result of sexual assault may have the 24–hour waiting requirement waived if she has reported the assault to law enforcement authorities and the abortion provider verifies that such a report has been made. § 253.10(3m)(a). A woman who alleges that she is pregnant as a result of incest may have the 24–hour requirement reduced to a two-hour wait if she has reported the incest to law enforcement authorities and the abortion provider verifies that the report has been made. § 253.10(3m)(b).

### 4. *Hotline—§ 253.10(4)*

The Department of Health and Social Services may maintain a toll-free telephone number available 24 hours a day to provide the state-printed materials specified in § 253.10(3)(d)1.

### 5. *Penalty—§ 253.10(5)*

Any person who violates § 253.10(3) or (3m)(a)2. or (b)2. is required to forfeit not less than $1,000 and no more than $10,000.

### 6. *Civil remedies—§ 253.10(6)*

Any person who violates § 253.10(3) or (3m)(a)2. or (b)2. is liable to the woman on whom the abortion was performed for damages arising out of the abortion, including damages for personal injury and emotional and psychological distress and punitive damages of not less than $1,000 or more than $10,000. Attorney fees are available for such civil suits. A civil suit may be brought even if the physician or her assistant has not been convicted under § 253.10(5).

### 7. *Affirmative defense—§ 253.10(7)*

If an abortion provider makes a reasonably diligent effort to obtain the state and county produced written materials and they are not available, the provider will not be liable for failing to offer them to her patients.

### 8. *Construction—§ 253.10(8)*

Nothing in § 253.10 may be construed as creating or recognizing a right to abortion or as making lawful an abortion that is otherwise unlawful.

### C. *Application of § 253.10 to Minors*

If the woman considering an abortion is a minor, a physician may not perform an abortion unless he first obtains the minors voluntary and informed written consent as provided in § 253.10 and obtains the voluntary and informed written consent of one of her parents, or of her guardian or legal custodian, or of an adult family member or, under certain conditions, of one of her foster parents or treatment foster parents. § 48.375(4)(a); *see also* § 253.10(3)(c)7. A minor's consent is sufficient on her own if a court has granted her a waiver of parental notification pursuant to § 48.375(7). § 253.10(3)(c)7; § 48.375(4)(a)2.

### D. *Discipline for Violation of § 253.10*

Nurses, social workers, marriage and family therapists and professional counselors are subject to loss, limitation or suspension of their licenses for violations of § 253.10. § 441.07(1)(f); § 457.26(2)(gm). The state medical examining board is required to investigate allegations of unprofessional conduct lodged against persons holding a license, cer-

tificate or limited permit granted by the board. An allegation that a physician has violated § 253.10(3) (the dissemination of oral and printed information provisions) is an allegation of unprofessional conduct and therefore must be investigated. § 448.02(3)(a). If the medical examining board establishes that the physician is guilty of unprofessional conduct, it may limit, suspend or revoke that physician's license. § 448.02(3)(c).

## FACTS

From the evidence adduced at the October 1996 hearing, I find the following facts.

### A. The Parties

Plaintiff Elizabeth Karlin, M.D., is a physician at the Women's Medical Center in Madison, Wisconsin, where she provides abortions and birth control counseling. Plaintiff Gary Prohaska, M.D., is director of abortion services for plaintiff Planned Parenthood of Wisconsin, Inc. He provides abortions at clinics in Milwaukee and Appleton, Wisconsin. Plaintiff Dennis Christensen, M.D., is the medical director of the Madison Abortion Clinic in Madison, Wisconsin and runs another abortion clinic in Niles, Michigan. Plaintiff Summit Women's Health Organization is an abortion facility in Milwaukee, Wisconsin.

Defendant James E. Doyle is Attorney General of the State of Wisconsin. Defendant C. William Foust is district attorney for Dane County, Wisconsin. Defendant E. Michael McCann is district attorney for Milwaukee County, Wisconsin. Defendants James Chambers, Michael Mehr, B. Ann Nevaiser, James Esswein, Rudolfo Molina, W.R. Schwartz, Mikki Patterson, Sidney Johnson, Sandra Makhorn, Pablo Pedraza, Glenn Hoberg, Wanda Roever, Ronald Grossman and Darold Treffert are members of the Wisconsin Medical Examining Board. Defendants Elaine August, Timothy Burns, Bonnie Creighton, Ruth Lindgren, Pamela Maxon, Lorraine Norem, Roberta Overby, McArthur Weddle and Ann Brewer are members of the Wisconsin Board of Nursing. Defendants Muriel Harper, Virginia Heinemann, Cornelia Hempe, Douglas Knight and Anita Kropf are members of the Wisconsin Examining Board of Social Workers, Marriage and Family Therapists and Professional Counselors.

Defendant Joseph Leean is Secretary of the Wisconsin Department of Health and Family Services. Defendant K.B. Piper is Administrator of the Division of Health of the Wisconsin Department of Health and Family Services.

### B. Reported Induced Abortions in Wisconsin

In 1995, the latest year for which statistics exist, 12,782 reported induced abortions were performed in Wisconsin. This number represents 19 abortions for every 100 live births in the state and 11 abortions for every 1000 Wisconsin women aged 15 to 44. 650 of these abortions were performed on out-of-state women. In 1994, 13,396 reported induced abortions took place in the state, of which 87% were performed on women who lived within 74 miles of an abortion provider. The annual number of abortions in Wisconsin has been declining since 1980, with the exception of two years that had minor increases.

### C. Location of Abortion Providers in Wisconsin

In the state of Wisconsin, abortions are available only in the cities of Madison, Milwaukee, Appleton and Green Bay. Plaintiffs Karlin and Christensen provide abortions at clinics in Madison. Plaintiff Prohaska offers abortions at Planned Parenthood locations in Milwaukee on Tuesdays, Fridays and every other Saturday and in Appleton at the Appleton North Clinic on Wednesdays and Thursdays. Planned Parenthood has no other physicians that work for it as abortion providers. In Milwaukee, abortions are also available at Summit Women's Health Organization. Women can receive abortions at a facility in Green Bay but the charge is approximately $100 more than Planned Parenthood charges; many women choose to go to the Planned Parenthood facilities in Appleton or Milwaukee to save money. Abortion clinics exist in Duluth, Minnesota and in Minneapolis–St Paul, Minnesota. A private gynecologist in Michigan's Upper Peninsula provides abortions through the tenth week of pregnancy. She charges approximately $200 more than Planned Parenthood does.

Plaintiff Karlin has had at least two patients from Superior, Wisconsin, which is ap-

proximately six hours from Madison. Some of plaintiff Karlin's patients find it hard to get to her office because they cannot get away from work easily or they have financial, mental health, drug, or partner abuse problems. Two of her patients have been tracked down by anti-abortion protesters and one had anti-abortion posters and photographs of fetuses placed on her lawn. Abortion protesters have recorded the license plate numbers of patients at the Summit Women's Health Organization and in at least one instance have tracked the patient home.

The Appleton North Clinic provides approximately 1,400 abortions a year to women from a wide area of Wisconsin and from the Upper Peninsula of Michigan. Patients come from as far south as Fond du Lac and Milwaukee, as far north as Superior and Houghton, Michigan (230 miles from Appleton), and as far west as Eau Claire. In 1995, the clinic had 100 patients from the Upper Peninsula, none of whom lived closer than 80 miles to the clinic. Some women go to the Appleton North Clinic instead of a clinic closer to home because of fear of being recognized at the local clinic. In September 1996, 30% of the Appleton North Clinic's 112 patients traveled over 80 miles to come to the clinic.

If patients must make two trips to an abortion provider, travel time and costs will increase, patients will have to take more time off work and will lose more income, they will have to pay more for child care and they will have more trouble maintaining their privacy and explaining their absences from work or from home. The latter is a special concern for patients in abusive relationships. (Approximately 15% of Dr. Karlin's patients have been involved in abusive relationships, with a much smaller number being involved in abusive relationships at the time they come to the clinic.)

### D. *Scheduling at Wisconsin Abortion Facilities*

Patients who call the Summit Women's Health Organization to schedule an appointment for an abortion generally have to wait one to seven days before receiving the abortion.

At the Appleton North Clinic, 70% of women receive an appointment approximately a week after their initial scheduling call. One percent of women can be scheduled in less than a week; the remaining 29% must wait more than a week.

Planned Parenthood physician Gary Prohaska performs a one-day abortion procedure on women whose fetuses are under 13 weeks' gestational age. Women who are 13 or 14 weeks' pregnant may have a one or two-day procedure. Patients over 14 weeks have a two-day procedure. Prohaska does not perform abortions beyond 16 weeks. The two-day procedure begins when Prohaska inserts osmotic dilators, which must remain in place overnight to allow the cervix adequate time to dilate. Prohaska performs two or three of these two-day procedures a week. If he had to personally meet with and perform a physical examination on each of his patients 24 hours in advance of the abortion procedure, the number of patients he could see would be reduced by approximately 5006. For two-day procedures in Appleton, patients would likely have to wait another week to receive an abortion, because Prohaska would need to meet with them three times. This delay could increase the health risk and cost to the patient.

Patients who call the Women's Medical Center in Madison to schedule abortions generally receive an appointment one to two weeks later. The center offers appointments on Monday, Tuesday, Thursday and Friday. Patients arrive between 8 and 11 a.m. and the doctor operates until about 1 or 2 p.m.

The average length of time between a woman's first call to the Madison Abortion Clinic for an appointment and her appointment to undergo the abortion procedure is one week. Very few of Dr. Christensen's patients have abortions on the same day they call for an appointment, although Dr. Christensen tries to see a patient immediately if she has medical complications. Dr. Christensen performs first and second trimester abortions primarily but does abortions up to 22 weeks' pregnancy (or 24 menstrual weeks).

E. *Pre–Abortion Counseling under Existing Legislation*

1. *Summit Women's Health Organization*

A woman who arrives for an abortion at Summit Women's Health Organization must check in at the reception desk where she is given a packet of information to fill out, including a medical history form, a counseling form and a patient consent form. The counseling form explains the abortion procedure and advises the patient about potential risks of abortion, such as infection, perforation of the uterus, missing part of the pregnancy and adverse reactions to the local anesthetic. When the medical history form is completed, the woman has lab work done to confirm that she is pregnant and to check whether she is anemic. After this, the woman spends approximately 30 minutes with a counselor who talks to her about the procedure itself, its risks and complications and how to take care of herself after the abortion. Sometimes the counseling is done in groups of up to five women in a room separate from the reception area. The woman fills out the counseling and patient consent forms at that time, after the counselor has explained them to her. Women who have second trimester abortions receive more detailed counseling about potential risks.

After the counseling is completed, the woman pays for the procedure and is taken into an area where she changes into a gown. A nurse takes the woman's vital signs. The patient waits until she is called to see the doctor. When she is called, she enters the room where the procedure is to be performed and meets the doctor for the first time. While the woman is seated on the operating table, the doctor talks to the patient and does a pelvic exam. The woman lies down on the table and the doctor prepares her vagina for surgery. Generally, it takes from five to ten minutes from the time the doctor encounters the patient to the preparation of the vagina.

The doctor performs the abortion by inserting a speculum in the woman's vagina, giving the woman a local anesthetic, dilating the woman's cervix, inserting a vacurette and suctioning out the contents of the woman's uterus. The vacurette procedure takes ap-proximately one or two minutes, but lasts longer for a second trimester abortion.

2. *Women's Medical Center*

Women who come to the Women's Medical Center for an abortion undergo a process similar to that at the Summit Women's Health Organization and can expect to spend an hour and a half to two hours at the center. A woman meets the receptionist and is given a number of papers to fill out, including a personal history form, a medical history form and a medical data sheet. Generally, she then goes to the laboratory for a urine pregnancy test and blood work, after which she waits to meet with a counselor who talks to her about her pregnancy, her feelings about the pregnancy, life problems that brought her to the clinic and medical risks of the procedure. If patients have specific questions about the risks, the counselor refers them to Dr. Karlin. If the patient decides to continue with an abortion, she receives a description of the procedure and is able to see the instruments that are used. The counseling can last anywhere from 15 minutes to an hour depending on the patient. The counselor may ask about previous pregnancies and abortions. The counselor takes notes on the conversation and discusses any potential problems with Dr. Karlin before Dr. Karlin meets the patient. At some point after counseling is completed, the patient is asked to sign an informed consent form that discloses the risks of infection, bleeding, uterine perforation and additional complications that an abortion may cause. The counselor's office contains a number of pamphlets and other information about abortion.

Each patient is taken by one of Dr. Karlin's medical assistants to have an ultrasound to determine the gestational age of the pregnancy. From there, the patient proceeds to the operating room and waits, still dressed, for Dr. Karlin, who talks to the patient about any problems highlighted by the counselor and about the procedure itself. If Dr. Karlin is satisfied that the woman is resolute in her decision, she leaves the room to allow the patient to get undressed, after which she returns to do a brief physical exam and proceed with the abortion. Only in rare

cases has Dr. Karlin found that a patient was so apprehensive or upset that it was advisable to ask her to come back on another day. The vast majority of patients have made their decisions to have abortions by the time they arrive at the clinic. However, Karlin makes sure that a woman is certain of her decision before performing an abortion.

The patient remains in the procedure room for about five minutes. When she feels ready, she goes to the recovery room for approximately 20 minutes. Dr. Karlin gives the patient aftercare instructions and discusses birth control options with her. She advises all patients to come in for a follow-up exam two to three weeks after the abortion and urges them not to have intercourse during that time so as to decrease the risk of cervical infection.

### 3. Planned Parenthood

Patients at Planned Parenthood meet with counselors before undergoing an abortion. Planned Parenthood provides information about fetal development to patients only if they ask. Plaintiff Prohaska has had patients that became upset after seeing fetal development information. Plaintiff Prohaska meets his patients for the first time when they are on the operating table. He introduces himself, performs a pelvic and general physical examination and then does the abortion procedure. The whole process takes about four to five minutes. Prohaska does not follow up on the topics covered by the Planned Parenthood counselors or discuss the risks of abortion with patients unless they ask.

### 4. Madison Abortion Clinic

Counselors at the Madison Abortion Clinic meet with patients for approximately ten minutes to an hour before the abortion. The counseling takes less time for women who have had previous abortions. Dr. Christensen does not meet with patients until they are in the operating room.

### 5. Appleton North Clinic

Karen Kuhn, counselor at the Appleton North Clinic, routinely offers information on fetal development to clinic patients. Patients can expect to spend up to three hours at the clinic for counseling and the procedure.

### F. Definition of Qualified Physician

Plaintiff physicians do not know how to gauge whether they or any other doctors are "qualified physicians" as defined by Wis. Stat. § 253.10(2)(g) because they are unsure what "training or experience" suffices under the statute. Plaintiffs believe that because of the ambiguity of the "qualified physician" provision, they could not rely on another physician to perform an informed consent discussion under AB 441. Dr. Scott Spear, M.D., is an associate director for clinical services at University Health Services, University of Wisconsin, an assistant professor of pediatrics at the University of Wisconsin, and a regular provider of primary care to pregnant women. He would be interested in serving as a qualified physician, but is concerned that AB 441 is too vague for him to be able to participate without a significant risk of civil liability.

Dr. Basil Jackson, a psychiatrist practicing in Milwaukee, believes that the factors that are important to being a qualified physician under AB 441 include sensitivity, basic psychological knowledge, interviewing skills, ability to understand unconscious communication coming from the patient and the cognitive, intellectual and emotional ability to integrate all these factors to come to a clinical conclusion. Dr. Jackson does not know how a doctor would determine that he or she were a qualified physician authorized to provide the informed consent counseling required by AB 441.

Dr. John Gianopoulos, associate professor of obstetrics and gynecology at Loyola University's Stritch School of Medicine in Chicago, Illinois, believes that any doctor with training in obstetrics and gynecology would be a qualified physician under the statute. It is his view that any physician could become a "qualified physician" by doing intensive reading and attending a half-day to a day seminar with a certification exam at the end of the seminar. The physician would need to become familiar with the risks, complications and potential problems of abortions.

### G. *Emergency Contraception*

Several different types of medication can be used as emergency contraception. They are commonly referred to as "morning-after pills." It is probable that they operate before the implantation of the zygote into the wall of the uterus.

Approximately once a week, Dr. Karlin prescribes emergency contraception for a patient. The prescribed procedure consists of two large doses of birth control pills, with the first dose taken as soon as possible after intercourse and the second dose 12 hours later. A 24–hour delay would delay the effectiveness of emergency contraception.

### H. *Definition of Pregnancy*

Standard medical texts describe the beginning of pregnancy as the time of implantation of a zygote into the uterus, about six days after conception. Some doctors, including Dr. Nina Kiekhaefer, one of defendants' witnesses and an obstetrician in private practice, believe that pregnancy begins with conception. Dr. Kiekhaefer acknowledged that there is no way to determine whether a woman is pregnant before implantation of the zygote into the uterus.

### I. *Emergency Abortions*

A number of problems can arise during pregnancy, some of which might necessitate an immediate abortion in order to protect the mother's health. Possible examples include 1) transient ischemic attacks; 2) heavy vaginal bleeding; 3) premature rupture of amniotic membranes; 4) spontaneous abortion (miscarriage); 5) hyperemesis (nausea and vomiting over and above the amount that most women experience during pregnancy); 6) cardiac problems; and 7) preeclampsia In addition, psychological emergencies might warrant waiver of the 24–hour waiting period. When these conditions occur, reasonable medical opinion can differ whether emergency abortions are necessary to protect the health of the mother.

Dr. Karlin has seen three women who needed immediate abortions for the sake of their health. One was suffering small transient ischemic attacks during pregnancy and in Dr. Karlin's opinion needed an abortion to avoid a large-scale stroke, although the woman's own doctor did not believe an abortion was necessary. The other two were at risk because of heavy vaginal bleeding.

Dr. Prohaska has not performed an emergency abortion since he has worked for plaintiff Planned Parenthood. Dr. Christensen has terminated pregnancies for women with premature ruptured membranes who might face a risk of serious infection if an abortion were not performed as soon as possible. Dr. Christensen sees several patients a year who have excessive bleeding or hyperemesis or who are in the process of spontaneous abortion. Dr. Christensen believes there is no medical reason to delay that procedure but acknowledges that some doctors might believe otherwise.

### J. *Risk of Psychological Trauma Associated with Particular Abortion Procedure*

After undertaking an examination of the health effects of abortion at the request of President Reagan, Surgeon General C. Everett Koop concluded that "the scientific studies do not provide conclusive data about the health effects of abortion on women." With respect to the effects of abortion on women's psychological health, Koop found that the approximately 250 published studies on the topic were too flawed methodologically to provide any conclusive results to support the premise that abortion does or does not cause or contribute to psychological problems.

On November 16, 1989, the Committee on Government Operations approved and adopted a report prepared by the Human Resources and Intergovernmental Relations Subcommittee entitled "The Federal Role in Determining the Medical and Psychological Impact of Abortion on Women." The report contained the subcommittee's findings of its oversight investigation of the Surgeon General's study and a report on the psychological impact of abortion on women, including conclusions reached after a public hearing held on March 16, 1989 to review the information compiled by the Surgeon General and his staff. The subcommittee found that "[r]egardless of their position on abortion, mental health experts agree that much of the research on psychological impact [of abortion]

is flawed." The subcommittee concluded that the weight of the evidence and the Surgeon General's own testimony tend to indicate that psychological problems caused by abortion are not a major health problem. The report recognizes the significant role abortion politics plays in researchers' findings.

Since 1989, researchers have completed a number of additional studies on the psychological impact of abortion. The better evidence tends to show that abortion does not lead to post-traumatic stress disorder in and of itself. However, the results of the studies are still mixed. Even researchers who believe that abortion does not cause severe psychological trauma acknowledge that some women may experience symptoms of distress, depression or guilt immediately after an abortion. Experts agree that abortion can worsen a woman's preexisting emotional problems. Plaintiffs' expert, Dr. Nada Stotland, chief of psychiatry at Illinois Masonic Medical Center in Chicago, Illinois, has written that "abortion is rarely a psychologically painless procedure." Plaintiffs Karlin and Christensen make available to their patients a pamphlet entitled "How to Cope Successfully After an Abortion" by Anne Baker, that explains that although most women do not report severe trauma after an abortion, some women may experience sadness, guilt, anger and regret; the author suggests ways to cope with these "troublesome feelings." Dr. Karlin has had patients who have had serious emotional reactions to abortions. Her standard medical chart includes a preprinted notation to check if she believes the patient is suffering post-traumatic stress disorder.

There is no evidence that psychological risks vary according to the specific abortion procedure employed.

### K. Auscultation of Fetal Heart Tone Services

Fetal heartbeats can be auscultated (or listened to) in two ways: a hand-held ultrasound machine and a stethoscope. With the hand-held ultrasound machine, the earliest a fetal heartbeat can be heard is about 10 to 12 weeks' gestation. Using a stethoscope, the heartbeat cannot be heard until 16 to 20 weeks' gestation. Dr. Karlin performs abortions as early as about six weeks' gestation.

### L. Informed Consent Outside the Abortion Context

To obtain the informed consent of a patient to any surgical procedure, several steps are necessary. First, a number of details must be explained to the patient, including the necessity of the intended procedure, a complete description of the procedure and any potential surgical alternatives, potential short-term complications, potential long-term problems or disabilities, alternative methods of therapy and required follow-up care. Second, the patient must have an opportunity to ask questions. Finally, the person gathering the informed consent must assure herself that the patient has understood all the information. AB 441 includes all these steps. The informed consent law in place before AB 441 included all these steps, although it did not require that informed consent be obtained by a physician. In the opinion of defendants' expert, Dr. John Gianopoulos, associate professor of obstetrics and gynecology at Loyola University Stritch School of Medicine in Chicago, Illinois, the prior law was adequate to insure informed consent for a woman obtaining an abortion.

It is common for physicians to obtain informed consent information from patients before performing a surgical procedure, although there are instances in which this responsibility is delegated to a non-physician working with the doctor.

### M. Medical Assistance for Visits to Abortion Clinics

Medical assistance under Medicaid in Wisconsin does not pay for abortions except in three situations: to save the life of the mother, in the case of rape or incest or to avoid permanent lifelong impairment to the woman. Pregnant women may qualify for Medicaid coverage during the pregnancy and up to 60 days thereafter if their income is between zero and 185% of the federal poverty rate. As administered in Wisconsin, this medical assistance would cover the cost of transportation to and from a physician for the initial pre-abortion visit required by AB 441, as well as the cost of the visit, but not the costs of the procedure itself (unless it falls within one

of the specified exceptions) or the expenses of child care or lost wages. The state or federal legislatures could change the provision of such medical assistance at any time.

### N. *Liability of Father for Assistance in Support of Child*

In cases of pregnancies by sexual assault and incest, it is psychologically damaging to inform a patient that the father may have parental responsibility for the child. When a patient's fetus has been diagnosed with a lethal anomaly, it is both cruel and medically unnecessary to provide information about the father's liability for assistance and the child care assistance offered by the state.

### O. *Twenty–Four Hour Waiting Period*

In its *Standards for Obstetric–Gynecologic Services,* the American College of Obstetricians and Gynecologists recommends that after a woman has been counseled on the options of managing her unwanted pregnancy, she "should be allowed sufficient time for reflection before she makes an informed decision." The college does not say that she should be "required" to reflect for a given period of time.

### P. *Rape, Incest and Battered Women*

Rape and incest are vastly underreported crimes. Battered women are monitored closely by their abusers, meaning that these women must explain all absences from home. In 53% of cases in which a man batters his wife, he batters the children also. This may make a battered woman afraid to leave the house overnight. In 1995, 92% of the sexual assaults reported in Wisconsin were committed by someone known to the victim.

The Madison Police Department does not release records of sexual assault cases to victims or to the general public. Under present policies, if a physician called the Madison Police Department to verify that a patient had filed a sexual assault report, the department would not confirm or deny the existence of such a report. The department has not discussed modifying its policies in response to AB 441, but would be open to doing so upon consultation with the city attorney if the injunction on AB 441 were lifted. It would take at least several weeks for the department to develop a policy.

The Milwaukee Police Department issues written confirmations to adult victims of sexual assault who have filed reports with the department. These written confirmations are available between 8:00 a.m. and 4:00 p.m. Monday through Friday. Confirmations are not issued over the phone. The department is willing to modify its policies in response to AB 441.

### Q. *Effects of Two–Trip Requirement of Mississippi Abortion Waiting Period Law*

On August 8, 1992, an abortion waiting period law similar to AB 441 went into effect in Mississippi when an injunction that had been imposed on the law was lifted. The law has been interpreted to require a woman to make two visits to an abortion provider, one for an initial counseling session and another at least 24 hours later for the procedure itself.

### R. *North Dakota's Experience with Abortion Waiting Period Law*

Since March 17, 1994, the state of North Dakota has had an abortion waiting period law similar in many respects to AB 441. The law requires a woman to receive certain information 24 hours before she has an abortion, but in contrast to AB 441, the law permits the information to be provided over the phone. When patients telephone Fargo Women's Health Organization to set up an appointment, the organization asks its patients whether they would like to receive state-printed brochures containing the names of agencies providing alternatives to abortion and information on fetal development Only one or two percent of the organization's patients accept these materials. A staff member explains to the patient the relative risks of abortion compared to full-term delivery, the medical risks of abortion, the name of the physician performing the abortion, how far into the pregnancy the woman is, her eligibility for medical assistance benefits should she have the child and the liability of her sexual partner for child support. Most women are impatient when listening to this information. The law has not reduced the number of patients seeking abortions in North Dakota.

## OPINION

## I. INTRODUCTION

Few, if any, contemporary social issues evoke the emotion that abortion does. Considering the issue dispassionately requires great effort, bound up as it is with deeply held opinions about the role and function of women in society, religious and personal views about the relative importance of unborn and living persons, attitudes about sexual behavior, beliefs about whether decisionmaking concerning childbearing should be left to individuals or monitored by the government, and personal life experiences. Persons of commitment and tenacity on each side of the issue fight tirelessly to influence state and federal abortion policies. Common ground is rare.

Although abortion remains intensely political, since *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), abortion has moved beyond the realm of politics and taken on a constitutional component. Although abortion remains intensely political, courts now play an important role in articulating the constitutional limitations of abortion legislation. *Roe* recognized that the United States Constitution insulates a woman's right to choose from majoritarian political pressure and prevents the states from overriding completely a woman's right to make a decision concerning the unborn life she carries. At the same time, the Court acknowledged that the state has important interests in protecting maternal health and potential life. *Id.* at 150, 93 S.Ct. at 725. Since 1973, when *Roe* was decided, the Court has devoted considerable energy to delineating the competing interests and sorting out the proper relationship among them, but in reflection of the complexity of the issue and the lack of societal consensus, it has been unable to achieve a clear and lasting balance.

## II. ABORTION, THE CONSTITUTION AND THE RIGHT TO PRIVACY

### A. *Fourteenth Amendment*

The Fourteenth Amendment of the United States Constitution provides:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

In the 130 years since the Fourteenth Amendment was ratified in 1868, state and federal courts have spent immeasurable time attempting to determine its exact meaning. Although the language of the amendment seems simple enough, the underlying rights that the amendment seeks to protect are fluid and difficult to pin down in precise terms. It is no elementary matter to say just what due process and equal protection mean as applied to the concrete factual situations of the late twentieth century.

■ This case focuses on the meaning of the Fourteenth Amendment's due process clause, the constitutional basis for a woman's "right to choose." (The Fifth Amendment, which protects citizens from actions by the federal government, contains a due process clause that provides similar textual support for the "right to choose." Because this case involves a state law rather than a federal one, the analysis will focus on the Fourteenth Amendment exclusively.) The due process clause has come to embody two related, but distinct concepts: procedural due process and substantive due process. Procedural due process guarantees that before a state deprives an individual of life, liberty or property, it must afford that individual a fair decisionmaking process. For example, before a state sends one of its citizens to prison for committing a crime, it must offer that person a legitimate opportunity to challenge its reasons for doing so. Generally, that process comes in the form of a trial. Procedural due process is unconcerned with outcomes: as long as fair decisionmaking processes are offered, procedural due process is satisfied.

■ Substantive due process is concerned with results. Rather than guaranteeing an individual the right to a fair decisionmaking procedure, substantive due process prevents the state from taking certain actions even if

it does provide procedural safeguards. The state can offer all the process it wants, but there are certain areas outside the scope of legitimate state involvement that substantive due process prevents a state from entering unless it has compelling reasons and acts in the most narrowly tailored manner possible. Exactly what these areas are is a matter of considerable debate, because the text of the Constitution does not set any explicit limits on substantive due process rights. Critics argue that substantive due process allows courts to fashion rights out of thin air and to strike down pieces of legislation for no other reason than disagreement with the goal of that legislation. *See Causeway Medical Suite v. Ieyoub*, 109 F.3d 1096, 1113–24 (5th Cir.1997) (Garza, J., concurring) (tracing the history of the Supreme Court's substantive due process jurisprudence and criticizing it). Although both the idea and the scope of substantive due process are hotly contested, the United States Supreme Court recognizes that certain governmental actions are incompatible with individual liberties and democratic principles and that substantive due process remains a valid component of constitutional jurisprudence.

■ When the Supreme Court deems a right so important that it falls within the ambit of substantive due process, the court labels it a "fundamental right." Courts give close scrutiny to legislation that affects fundamental rights, upholding a challenged law only if it promotes a compelling state interest and is written in a manner narrowly tailored to further that critical state goal. At issue in this case is the "right to privacy," a realm of personal liberty into which the government may not tread and a right that the Court has recognized as fundamental. The right to privacy is not announced explicitly anywhere in the Constitution and its boundaries are fuzzy. Yet over the course of this century, the Supreme Court has found the right to extend to such areas as child rearing and education, *Pierce v. Society of Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); procreation, *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); family relationships, *Prince v. Massachusetts*, 321 U.S. 158, 64

S.Ct. 438, 88 L.Ed. 645 (1944); contraception for married couples, *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); marriage, *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); and contraception for unmarried individuals, *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972). Most important for purposes of this case, the Court held in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147, that the right of privacy extended to "a woman's decision whether or not to terminate her pregnancy." *Id.* at 153, 93 S.Ct. at 727.

■ The right to privacy is a firm component of the "liberty" protected by the Fourteenth Amendment. *See Casey*, 505 U.S. at 846, 112 S.Ct. at 2804 ("Constitutional protection of the woman's decision to terminate her pregnancy derives from the Due Process Clause of the Fourteenth Amendment."); *but see* Sheldon Gelman, *"Life" and "Liberty": Their Original Meaning, Historical Antecedents, and Current Significance in the Debate Over Abortion Rights*, 78 Minn. L.Rev. 585 (1994) (arguing that proper constitutional basis of right to abortion is not "liberty" but concept of "life" embodied in the due process clause; when the Constitution was drafted in 18th century, "life" encompassed more than mere biological existence but physical integrity and even a minimum quality of life as well). The right to privacy encompasses a person's most basic decisions about family and parenthood, choices that are "central to personal dignity and autonomy." *Casey*, 505 U.S. at 851, 112 S.Ct. at 2807. The liberty protected by the Fourteenth Amendment includes "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Id.*

B. *The Supreme Court's Abortion Jurisprudence 1973–1989, Roe through Webster*

When the Court determined in *Roe*, 410 U.S. 113, 93 S.Ct. 705, that the right to privacy extended to a woman's decision to terminate her pregnancy, it did not hold that

the state could not regulate abortion. The Court recognized that the state's interests in protecting maternal health and potential life were compelling, valid governmental objectives and it sought to resolve the tension between a woman's interests and the state's interests through a trimester framework. During the first trimester of a woman's pregnancy, the woman's rights superseded the rights of the state; the state could not impose any restrictions on her decision to terminate the pregnancy. After the end of the first trimester, the state's interests in maternal health became stronger. At this point, the state could impose regulations reasonably related to the protection of maternal health such as licensure of abortion providers and abortion facilities to insure safe, quality care but it could not promulgate regulations designed purely to protect fetal life. At the point of viability, roughly the beginning of the third trimester, the state's interests in protecting potential life became compelling, thereby allowing the state to proscribe post-viability abortions except when necessary to preserve the life or health of the mother. *See id.* at 162–65, 93 S.Ct. at 731–33.

The Court revisited *Roe* in 1983 and 1986, each time reaffirming the central tenets of its landmark 1973 decision. *See Thornburgh v. American College of Obstetricians and Gynecologists,* 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (holding unconstitutional Pennsylvania regulation requiring woman to receive state printed materials discouraging abortion); *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (*Akron I*) (striking down law requiring all second trimester abortions to be performed in hospitals). The court returned to abortion issues again in 1989 in *Webster v. Reproductive Health Services,* 492 U.S. 490, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989), a case involving a series of regulations that Missouri had imposed on abortions. The case marked a turning point in the Court's abortion jurisprudence. Justices Rehnquist, White and Kennedy questioned whether *Roe*'s trimester framework should be retained. In their view, the use of the framework was difficult to justify: it had given rise to a "web of legal rules that have become increasingly intricate" and it rested on the questionable premise that the state's interest in protecting potential human life came into existence only at the point of viability. *Id.* at 518–19, 109 S.Ct. at 3056–57. Justice Scalia expressed the opinion that *Roe* should be overruled because the "cruel questions posed" in the abortion area are "political and not juridical." *Id.* at 532, 109 S.Ct. at 3064 (Scalia, J., concurring in part and concurring in the judgment).

*Webster* appeared to give a number of states confidence that more restrictive abortion regulations would be held constitutional. Pennsylvania, North Dakota, Utah and Guam passed new abortion legislation shortly after the opinion was issued. *See* Ruth Burdick, Note, *The Casey Undue Burden Standard: Problems Predicted and Encountered, and the Split Over the Salerno Test,* 23 Hastings Const. L.Q. 825, 828 n. 19 (1996). Pennsylvania abortion clinics and providers challenged that state's statute immediately in a case that reached the Supreme Court in 1992 as *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

### C. *Planned Parenthood of Southeastern Pennsylvania v. Casey*

Supreme Court observers watched *Casey* eagerly, expecting that it would provide the Court the opportunity to overrule *Roe.* But those who sounded the death knell of *Roe* were premature; the "essential holding" of *Roe* survived intact, *Casey,* 505 U.S. at 845–46, 112 S.Ct. at 2804, albeit in the context of a fragmented series of different opinions that evidenced deep divides among the justices. The opinion was unusual for the fact that Justices O'Connor, Kennedy and Souter wrote a joint opinion. They were joined in part by Justices Stevens and Blackmun. Chief Justice Rehnquist wrote an opinion concurring in part and dissenting in part and was joined in dissent by Justices White, Scalia and Thomas. Justice Scalia filed a concurring and dissenting opinion. Chief Justice Rehnquist and Justices White and Thomas joined in the dissent. Among the various opinions, the O'Connor, Kennedy, Souter opinion is controlling because it offers the narrowest grounds for the decision. *See Marks v. United States,* 430 U.S. 188, 97

S.Ct. 990, 51 L.Ed.2d 260 (1977) (when court is fragmented, opinion based on narrowest grounds is controlling); *see also Planned Parenthood of Southeastern Pennsylvania v. Casey,* 510 U.S. 1309, 1310 n. 2, 114 S.Ct. 909, 910 n. 2, 127 L.Ed.2d 352 (1994) (Souter, J., in chambers) (denying request for stay of court of appeals' mandate and explaining that O'Connor, Kennedy, Souter opinion in *Casey* is controlling). Unless otherwise stated, future references to *Casey* are to that opinion.

■ In *Casey,* the Supreme Court reaffirmed the essential holding of *Roe* but replaced *Roe*'s trimester framework with an "undue burden" standard. The Court reaffirmed the three parts of the essential holding of *Roe. Casey,* 505 U.S. at 846, 112 S.Ct. at 2804. First, a woman has a right to choose to have an abortion before fetal viability without undue interference from the state. *Id.; see* Sandra Lynne Tholen & Lisa Baird, Note and Comment, *Con Law is as Con Law Does: A Survey of Planned Parenthood v. Casey in the State and Federal Courts,* 28 Loy. L.A. L. Rev. 971, 978 n. 34 (1995) (noting that Justice O'Connor avoided labeling a woman's right "fundamental"). Second, the state has the power to prohibit abortions after viability as long as exceptions are made for pregnancies that endanger the life or the health of the mother. *Id.* Third, the state has legitimate interests in protecting the life of the mother and that of the fetus from the beginning of the pregnancy. *Id.*

The most important principle of *Roe* that remains is the use of viability as the dividing line between the woman's interests in terminating her pregnancy and the state's interests in protecting maternal and prospective life. The Court recognized that using viability may appear arbitrary, but admitted it could find no other more workable standard. *Casey,* 505 U.S. at 870, 112 S.Ct. at 2816–17. At the same time, however, the Court jettisoned the trimester framework on the ground that it undervalued the state's interest in prospective life by prohibiting the state from enacting any previability regulations designed to protect prospective life. *Id.* The Court substituted the new "undue burden"

standard as a means of accommodating the state's interest in expressing its concerns for unborn life from the outset of pregnancy while preserving a woman's right to make the critical decisions relating to childbearing.

■ Attempting to give flesh to the undue burden concept, the Court explained that although all abortion regulations impose some burden on women seeking to terminate their pregnancies, a law is not unconstitutional simply because it makes it more difficult for a woman to exercise her right to choose. *Casey,* 505 U.S. at 873, 112 S.Ct. at 2818. " '[T]he Constitution does not forbid a State or city, pursuant to democratic processes, from expressing a preference for normal childbirth.' " *Id.* at 872, 112 S.Ct. at 2818 (quoting *Webster,* 492 U.S. at 511, 109 S.Ct. at 3053). "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id.* at 874, 112 S.Ct. at 2819. "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Id.*

■ What makes a burden undue? Although this is the nub of the Court's opinion, it is the most difficult to decipher. The Court's answer is somewhat tautological:

A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus. A statute with this purpose is invalid because the means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it. And a statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends.

*Casey,* 505 U.S. at 877, 112 S.Ct. at 2820.

The Court's application of the test to the Pennsylvania statute at issue sheds some

light on the meaning of the test. The Pennsylvania law contained a number of provisions similar to those included in AB 441: 1) informed consent provisions requiring abortion providers to make available state-printed materials describing the fetus and providing information about medical assistance for childbirth, child support, adoption and other alternatives to abortion; 2) a 24–hour waiting period; 3) a medical emergency exception to the waiting period; and 4) parental consent for a minor's abortion. The law also contained a spousal notification provision, something not included in AB 441. The Court upheld all aspects of the law except the spousal notification requirement. *Id.* at 879–901, 112 S.Ct. at 2821–33.

The Court began with Pennsylvania's medical emergency provision, defined by statute as:

> [t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create serious risk of substantial and irreversible impairment of a major bodily function.

*Casey,* 505 U.S. at 879, 112 S.Ct. at 2822. The law's challengers argued that the definition was too narrow and did not cover serious medical conditions. The Court rejected that argument, relying on the court of appeals' holding that the Pennsylvania legislature intended the medical emergency exception to insure that compliance with the state's abortion regulations "would not in any way pose a significant threat to the life or health of a woman." *Id.* at 880, 112 S.Ct. at 2822 (citing *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 947 F.2d 682, 700–01 (3d Cir.1991)). Under the court of appeals' interpretation, the term "serious risk" encompassed the medical conditions that the challengers asserted would not be covered. Accordingly, the Court found that the medical emergency provision did not impose an undue burden on a woman's right to choose. *Casey,* 505 U.S. at 880, 112 S.Ct. at 2822.

Next, the Court turned to the statute's informed consent requirement, pursuant to which an abortion could not be performed unless a physician had informed a woman of the nature of the procedure, the health risks involved and the probable gestational age of the fetus. In addition, the physician or a qualified nonphysician had to inform the woman of the availability of printed materials published by the state that described the fetus and provided information about medical assistance, child support, adoption and other alternatives to abortion. *Id.* at 881, 112 S.Ct. at 2822. The Court upheld the informed consent provision, including the distribution of literature, specifically overruling *Akron I,* 462 U.S. 416, 103 S.Ct. 2481, and *Thornburgh,* 476 U.S. 747, 106 S.Ct. 2169, on this point It noted that the state of Pennsylvania had a substantial interest in guaranteeing that women were fully apprised of the health risks of abortion and childbirth before deciding whether to carry a pregnancy to term. *Id.* at 882, 112 S.Ct. at 2823. By expressing a preference for childbirth over abortion through the informed consent provision, the state furthered a legitimate goal of protecting the life of the unborn without imposing a substantial obstacle on women seeking abortions. *Id.* at 883, 112 S.Ct. at 2824. As long as the state information was "truthful and not misleading," the informed consent requirement was permissible. *Id.* at 882, 112 S.Ct. at 2823.

The 24–hour waiting period posed a more difficult question for the Court. It recognized that the district court had found that the Pennsylvania law would be "particularly burdensome" on poor women, women who lived far from abortion clinics and those who would have difficulty explaining their absences. *Casey,* 505 U.S. at 886, 112 S.Ct. at 2825. Nonetheless, the Court held that the burden was not significant enough to make it undue. *Id.* at 887, 112 S.Ct. at 2825–26.

The Court struck down the next aspect of the Pennsylvania law, the spousal notification provision, finding that the provision would impose a substantial obstacle for victims of spousal abuse rather than "merely mak[ing] abortions a little more difficult or expensive to obtain." *Id.* at 893–94, 112 S.Ct. at 2829. The Court upheld the statute's parental consent provision, which required the informed

consent of a parent or guardian before an abortion could be performed on a woman under 18, subject to a judicial bypass procedure. *Id.* at 899, 112 S.Ct. at 2832. The Court determined that the provision fit within the confines of its previous holdings concerning parental consent provisions and that the waiting period might make even more sense in the case of a minor whose family might need the time to discuss the decision together. *Id.* at 899–900, 112 S.Ct. at 2832.

Finally, the Court found constitutional the recordkeeping and reporting requirements of the Pennsylvania law, which required abortion facilities to file extensive information concerning the abortions they performed. The Court determined that the collection of information served a valid purpose in facilitating medical research and it could not be said that "the requirements serve no purpose other than to make abortions more difficult." *Id.* at 901, 112 S.Ct. at 2833.

### III. PLAINTIFFS' CHALLENGE TO AB 441

Plaintiffs challenge the constitutionality of AB 441 on three grounds. First, AB 441 has both the purpose and effect of imposing an undue burden on a woman's right to choose to terminate her pregnancy and therefore violates the Fourteenth Amendment's due process clause. Second, AB 441 violates plaintiffs' First Amendment right to freedom of speech by requiring physicians to purchase and disseminate information with which the physicians disagree. On a related First Amendment note, plaintiffs argue that the act violates the establishment clause by requiring the distribution of religious information. Third, plaintiffs maintain that AB 441 is unconstitutionally vague because it is replete with provisions so ambiguous that they fail to give physicians fair notice of the conduct the statute requires of them.

#### A. *Standing*

 Before plaintiffs can proceed on their argument that AB 441 imposes an undue burden on a woman's right to choose, they must establish their standing to raise such a claim. Plaintiffs are not women seeking to exercise their right to terminate a pregnancy. They are physicians and abortion clinics that are concerned about the impact that AB 441 will have on their practices and their patients if the law goes into effect.

Article III, section 2 of the Constitution limits the jurisdiction of the federal courts to "cases" and "controversies." *See Arizonans for Official English v. Arizona,* —— U.S. ——, ——, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997). In accordance with this constitutional limitation, the Supreme Court has developed a series of "justiciability" doctrines that confine the arena of potential claims that federal courts may entertain. For example, federal courts cannot hear cases that are not yet "ripe" for decision or cases that have become "moot" and no longer present an ongoing dispute. In addition, the persons or parties bringing a suit must have "standing," that is, a personal stake in the outcome of the case. Before a plaintiff can establish standing, he must show that he has suffered an "injury in fact," meaning an injury that is concrete and particularized and actual or imminent, not conjectural or hypothetical. He must also show a causal connection between his injury and the conduct complained of and that the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992).

If AB 441 goes into effect, plaintiff physicians will be subject to penalties under Wis. Stat. § 253.10(5) or loss of their medical licenses under Wis. Stat. § 448.02 for violating the new informed consent requirements. The gravity of such punishments is considerable and plaintiff physicians have reason to be concerned. The prospect of such an injury is not conjectural or hypothetical, despite defendants' remarkable contention that plaintiffs lack standing because the threat of prosecution is not credible or imminent Politically savvy district attorneys in counties with anti-abortion constituencies might see such suits as beneficial to their careers. Other district attorneys may have strong philosophical opposition to abortion and be inclined to prosecute to further their personal beliefs. Moreover, abortion opponents could take a long step to erasing a woman's right to choose with a few key prosecutions of the state's small group of abortion providers. As both pro-choice and pro-life advocates are well

aware, if abortions are not available, the right to choose becomes hollow. In sum, plaintiffs have standing to assert that AB 441 violates their own constitutional rights. *See Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973). Whether they have standing to assert the constitutional rights of their patients is a different question, but not a difficult one.

▉ Although as a general rule persons are required to assert their own rights, if a genuine obstacle prevents them from doing so another party may assert a right for them. *See Singleton v. Wulff*, 428 U.S. 106, 116, 96 S.Ct. 2868, 2875, 49 L.Ed.2d 826 (1976). In *Singleton*, Justice Blackmun explained the obstacles that women face in asserting their right to choose, including a desire to protect their privacy and the imminent mootness caused by the fact that pregnancies last only nine months while constitutional litigation lasts much longer. *Id.* at 117–18, 96 S.Ct. at 2875–76. Justice Blackmun concluded that "it is generally appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decision." *Id.* at 118, 96 S.Ct. at 2876. Although Justice Blackmun was joined in that conclusion by only three other justices, it is his view that holds favor today. *See Diamond v. Charles*, 476 U.S. 54, 65–66, 106 S.Ct. 1697, 1705, 90 L.Ed.2d 48 (1986) (citing *Singleton* for proposition that physician who demonstrates that abortion regulations have direct financial impact on his practice may assert constitutional rights of patients); *Akron I*, 462 U.S. at 440 n. 30, 103 S.Ct. at 2498 n. 30 (physician has standing to raise claims of his minor patients; *see also Carey v. Population Services Int'l*, 431 U.S. 678, 682, 97 S.Ct. 2010, 2014, 52 L.Ed.2d 675 (1977) (corporation has standing to represent rights of its customers). Indeed, in *Casey*, 505 U.S. 833, 112 S.Ct. 2791, the Supreme Court did not find it necessary to discuss the standing of the five abortion clinics and one physician challenging the Pennsylvania law. *See also Akron I*, 462 U.S. 416, 103 S.Ct. 2481 (no mention of standing problems with respect to three abortion clinic plaintiffs).

Defendants raise one additional challenge to plaintiffs' standing to raise the constitutional rights of their patients, arguing that plaintiffs' interests conflict with those of their patients. According to defendants, plaintiffs' desire to keep their practices financially viable blinds them to the importance of a woman's "right to know." The argument is specious. AB 441 is likely to decrease the time that Wisconsin physicians will have to perform abortions. This will mean that patients may have to wait longer or go elsewhere to obtain an abortion. Plaintiffs are well aware of this probable effect and understand its impact on a woman's right to choose to terminate her pregnancy prior to viability. Suggesting that plaintiffs are merely interested in maintaining a steady flow of cash slights plaintiffs' concern that AB 441 harms rather than protects the health of their patients. To the extent that certain patients would prefer their physicians to support their "right to know," they are represented adequately by the state.

B. *Fourteenth Amendment Arguments*

1. *Facial challenges to abortion regulations*

▉ The constitutionality of a law may be challenged in two ways. It may be challenged on its "face," meaning that the constitutional validity of the entire law is at stake, or it may be brought into question because of the way it is "applied" to the person or party challenging the law. If a court finds the law unconstitutional on its face, the law can never be applied. If the court finds the law unconstitutional as applied, the law may still be enforced but under different circumstances. *See generally* Michael C. Doff, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235 (1994) (arguing that distinction between facial and as applied challenges should be abandoned).

▉ As in *Casey*, plaintiffs are mounting a "facial" challenge to Wisconsin's new abortion legislation before it has gone into effect. In non-abortion cases, the Supreme Court has held that a party mounting a facial challenge must prove that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697

(1987). The fact that a law might be unconstitutional "under some conceivable set of circumstances is insufficient to render it wholly invalid." *Id.*

If *Salerno* applies to this case, defendants win, because there are at least some circumstances under which AB 441 would be constitutional. However, it is not clear *Salerno* is the appropriate test to apply. It is not even clear whether *Salerno* reflects traditional Supreme Court facial challenge jurisprudence accurately. *See Janklow v. Planned Parenthood, Sioux Falls Clinic,* —— U.S. ——, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996) (Stevens, J., respecting denial of petition for writ of certiorari). Justice Stevens agrees with Professor Doff that the standard the Court employed in *Salerno* is unnecessarily draconian and has little grounding in prior law. *Id.* at ——, 116 S.Ct. at 1583 (citing Doff, 46 Stan. L. Rev. at 236, 238). More important, in striking down the spousal notice provision at issue in *Casey,* the Supreme Court employed a standard quite different from that announced in *Salerno,* finding the spousal notice provision unconstitutional because "in a large fraction of cases in which [the law] would be relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey,* 505 U.S. at 895, 112 S.Ct. at 2830. Although the spousal notice provision would have imposed an undue burden on fewer than 1% of women seeking to exercise their right to choose, the Court held the law unconstitutional nonetheless. *Id.* at 894, 112 S.Ct. at 2829.

Lower federal courts have debated the question whether *Casey* rejected the application of the *Salerno* "no set of circumstances" standard in the abortion context. The Court of Appeals for the Fifth Circuit applied *Salerno* in *Barnes v. Moore,* 970 F.2d 12 (5th Cir.1992), a challenge to a Mississippi law similar to the Pennsylvania law in *Casey.* The court noted that it did not understand *Casey* to have overruled *Salerno* simply by applying a standard other than that of *Salerno. Id.* at 14 n. 2; *see also Causeway Medical Suite,* 109 F.3d at 1102–04 (declining to decide whether application of the *Salerno* test in *Barnes* was incorrect and should be overruled). Justice Scalia echoed this same

sentiment in his dissent from a denial of certiorari in *Ada v. Guam Soc'y of Obstetricians & Gynecologists,* 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., joined by Rehnquist, C.J., and White, J., dissenting), arguing that a Guam law that prohibited abortions except when two doctors confirmed that the pregnancy endangered the life or health of the mother should not be found facially unconstitutional because it would be constitutional as applied to post-viability abortions.

Justices O'Connor, Souter and Stevens believe *Casey* rendered *Salerno* inapplicable in the abortion arena. *See Janklow,* —— U.S. at ——, 116 S.Ct. at 1583; *Fargo Women's Health Org. v. Schafer,* 507 U.S. 1013, 1014, 113 S.Ct. 1668, 1669, 123 L.Ed.2d 285 (1993) (O'Connor, J., and Souter, J., denying request for stay and injunction pending appeal). A number of lower courts have agreed. *See Jane L. v. Bangerter,* 102 F.3d 1112, 1116 (10th Cir.1996) (undue burden rather than *Salerno* standard applies to abortion cases), *cert. denied sub nom. Leavitt v. Jane L.,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997); *Compassion in Dying v. State of Washington,* 79 F.3d 790, 798 n. 9 (9th Cir.1996) (en banc) (clear that Supreme Court has applied test other than *Salerno* to judge constitutionality of abortion regulations), *cert. granted sub nom. Washington v. Glucksberg,* —— U.S. ——, ——-——, 117 S.Ct. 37, 37–38, 135 L.Ed.2d 1128 (1996); *Planned Parenthood, Sioux Falls Clinic v. Miller,* 63 F.3d 1452, 1458 (8th Cir.1995) ("We choose to follow what the Supreme Court actually did—rather than what it failed to say—and apply the undue burden test It is true that the Court did not expressly reject *Salerno's* application in abortion cases, but it is equally true that the Court did not apply *Salerno* in *Casey.*") *cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic,* —— U.S. ——, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996); *Casey v. Planned Parenthood of Southeastern Pennsylvania,* 14 F.3d 848, 863 n. 21 (3d Cir.1994) (same); *A Woman's Choice–East Side Women's Clinic v. Newman,* 904 F.Supp. 1434, 1447–48 (S.D.Ind.1995) (same).

Further guidance on this matter from the Supreme Court would be helpful. In the interim, however, lower courts must make their best prediction of the Supreme Court's future treatment of the issue. My own reading of *Salerno* and *Casey* is that they are incompatible. *Salerno* was not intended to apply in the abortion context, and that applying it would render superfluous the Supreme Court's discussion and implementation of the undue burden test. The Court recognized as much by not applying it in *Casey*. But see *Casey*, 505 U.S. at 972–73, 112 S.Ct. at 2869–70 (Rehnquist, C.J., concurring in part and dissenting in part) (noting that joint opinion did not discuss *Salerno* ). The best evidence lies in what the Court did. Had it implemented the *Salerno* test in *Casey*, it would have had to uphold the spousal notification provision, which the Court conceded was constitutional in *some* contexts. In fact, the Court held that the law could be constitutional with respect to *99 %* of women seeking abortions and still be facially unconstitutional because it imposed an undue burden on 1% of abortion patients. *Casey*, 505 U.S. at 894, 112 S.Ct. at 2829.

Defendants argue that even if the Court rejected the application of *Salerno* to spousal notification provisions, it intended to retain *Salerno* for all other abortion regulations. The argument is not persuasive when considered in the overall context of *Casey* and the articulation of the undue burden standard. The Court did not explain the application of the undue burden standard to the other Pennsylvania statutory provisions because it did not think the evidence supported findings of undue burdens in those situations, but it was still applying an undue burden rather than a *Salerno* standard. Had it not been, it could have limited its inquiry to no more than a paragraph, explaining merely that some women would not be burdened in any way by the regulations and concluding that the law was constitutional on its face. That is not what the Court did. Instead, it looked at whether the burden of the medical emergency provision, the 24–hour waiting period and the parental consent requirement would be severe for a significant number of women. It upheld those regulations only after finding that even though they might make "abortions a little more difficult or expensive to obtain," *Casey*, 505 U.S. at 893, 112 S.Ct. at 2829, they would not prevent a significant number of women from obtaining abortions. From this I conclude that AB 441 should be subjected to the scrutiny of the undue burden test and that *Salerno* plays no role in the evaluation of plaintiffs' facial challenge.

2. *Explication of the undue burden standard*

Acceptance of the undue burden standard advances the inquiry, but does not lead directly to the application of the test to the statute. There remain important questions concerning the meaning of the undue burden test in cases decided after *Casey*. First, it is necessary to examine how the Court applied the undue burden standard in *Casey*. Although the Court did not apply the *Salerno* "no set of circumstances" test, the Court's implementation of the undue burden test in *Casey* does not seem entirely uniform. Second, it is necessary to explore whether *Casey* leaves open any possibility for mounting constitutional challenges to provisions found constitutional in *Casey*, or in other words, whether plaintiffs can use new factual evidence to show that a 24–hour waiting period or other regulations similar to those upheld in *Casey* impose an undue burden on a woman's right to choose. Finally, the purpose prong of the undue burden test must be analyzed to understand the predicate elements of that type of challenge.

a. The undue burden standard as applied in *Casey*

In *Casey*, the Court announced that a state abortion regulation is an undue burden if it has the "purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. at 2820. None of the Pennsylvania regulations was invalidated because of an invalid purpose and only the spousal notification provision was found unconstitutional because of its effect. The purpose prong of the test, which will be discussed in more detail later, does not require a court to look at the number of women that would suffer substantial obstacles in ob-

taining abortions. If the legislature's purpose in passing a given regulation is to hinder women's ability to exercise their right to choose, the law is unconstitutional no matter how many women would actually be affected adversely by the law. (It can probably be presumed that if the legislature's purpose is to impose an obstacle, a law passed with that design would affect a significant number of women.)

The effect prong, however, is concerned directly with the number of women affected. The Court would not strike down a law on a facial challenge merely because it imposed an undue burden on one or two women. The regulation must have an unconstitutional effect on a larger group of women. How much larger is an interesting question. In finding the spousal notice provision unconstitutional, the Court explained that the regulation would likely prevent a "significant" number of women from obtaining abortions. *Casey*, 505 U.S. at 893, 112 S.Ct. at 2828–29. The state of Pennsylvania argued that the number of women who would be affected by the spousal notice provision was less than one percent of women seeking abortions: those who would suffer any spousal abuse as a result of notifying their husbands about their abortions. The Court rejected that argument, noting that "[t]he analysis does not end with the one percent of women upon whom the statute operates; it begins there" and "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894, 112 S.Ct. at 2829. The Court found the provision unconstitutional, holding that in a "large fraction of the cases in which [the spousal notice provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Id.* at 895, 112 S.Ct. at 2830.

In analyzing the other regulations, the Court did not discuss the group of women who would be affected. It did not need to because it found that the hurdles imposed by those regulations merely made abortions a little more difficult or expensive to obtain. *Casey*, 505 U.S. at 893, 112 S.Ct. at 2828–29. The burdens were not undue. Implicit in that finding was the idea that the regulations

did not impose undue burdens on *any* women. Otherwise, the Court would have had to find that regulation unconstitutional as it did the spousal notification provision.

Analyzing the Court's actual application of the undue burden standard makes it apparent that the standard is a high one. Inconvenience, even severe inconvenience, is not an undue burden. To constitute an undue burden, the law must be likely to prevent women from obtaining abortions rather than just make abortions more difficult to obtain. However, once the Court finds that the regulation meets the strict standard, it will strike the law down even if it imposes an undue burden on only a small group of women. This explains why the Court found the 24–hour waiting period constitutional. *Casey*, 505 U.S. at 885–87, 112 S.Ct. at 2824–26. The waiting period would make abortions more difficult and expensive to obtain but would not prevent women from actually obtaining them; the waiting period was an inconvenience rather than an undue burden. The Court reached this conclusion even though the plaintiffs argued that the waiting period was like the spousal notification provision, in that it would be particularly burdensome for certain women. The plaintiffs contended that the burden of the 24–hour waiting period would fall heavily on women who were poor, those who lived far from abortion providers and those who had problems explaining their absences to spouses or employers. *Id.* at 886, 112 S.Ct. at 2825. The Court did not deny that the law would be particularly burdensome for these women but did not believe that the waiting period amounted to a substantial obstacle. *Id.* at 887, 112 S.Ct. at 2825–26.

It is not entirely clear how the Court determined that the 24–hour waiting period was not an undue burden for the women most likely to be affected by it. The Court noted that the district court had found as fact that a 24–hour waiting period would be "particularly burdensome" for poor women, those who lived far from abortion providers and those who had problems explaining their absences to spouses or employers, but it pointed out that the district court had not made a finding of fact that the waiting period would

amount to a "substantial obstacle" for any women. From this, the Court concluded that the waiting period was not an undue burden.

Under the Court's rationale, the district court should have predicted that the Court would adopt the undue burden standard, although at the time the district court was making its factual findings, the Supreme Court had never articulated such a standard for abortion cases. If it had, the district court might have included a finding of fact that the waiting period was a substantial obstacle. The district court did recognize that the waiting period would be burdensome, especially for the poor, those who lived at a distance and those who had trouble explaining absences. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 744 F.Supp. 1323, 1352 (E.D.Pa.1990). In fact, the district court held that the 24–hour waiting period imposed a "legally significant burden." *Id.* at 1378. Although the Court explained that its finding of no undue burden was based "on the record before us," the Court's decision that the waiting period did not impose an undue burden is hard to square with the district court's findings of fact. The Court's decision seems based on its own impression that a 24–hour waiting period does not actually prevent any women from obtaining abortions; it only makes obtaining them more difficult.

Plaintiffs have set out to prove that the Supreme Court's premise is wrong. According to plaintiffs, AB 441 and its 24–hour waiting requirement will prevent a significant number of Wisconsin women from obtaining abortions. In support of this argument, plaintiffs have submitted statistical studies purporting to show that after a 24–hour waiting period law went into effect in Mississippi, the number of Mississippi women undergoing reported abortions declined markedly. Putting aside the validity of the studies for the moment, plaintiffs approach requires a determination that the Court left open the possibility in *Casey* that regulations similar to those upheld in that case could be found unconstitutional under different factual circumstances. If that is not the case, it is likely that AB 441 is constitutionally valid because it differs from the Pennsylvania statute only in minor ways.

b. Role of factual evidence

The joint opinion in *Casey* did not address whether other states' abortion regulations could be found unconstitutional under different factual circumstances, even if they were modeled after *Casey*. Justice Blackmun expressed his confidence that future factual circumstances would show that the regulations upheld in *Casey* did impose undue burdens elsewhere. *Casey*, 505 U.S. at 926, 112 S.Ct. at 2845–46 (Blackmun, J., concurring in part and dissenting in part). Justice Scalia criticized Blackmun and the authors of the joint opinion for leaving open the possibility that constitutional jurisprudence was subject to such factual vicissitudes. *Id.* at 992–93, 112 S.Ct. at 2880–81 (Scalia, J., dissenting, "Reason finds no refuge in this jurisprudence of confusion."). The resulting uncertainty over the role of facts has left the lower federal courts uncertain whether they should conduct their own factual inquiries in similar cases or whether they are bound by the constitutional determinations made in *Casey*.

The first court to face the question was the district court that had decided *Casey*. On remand from the Supreme Court, the district court reopened the record to allow plaintiffs to present evidence showing how the Pennsylvania law would be unconstitutional under the new undue burden standard. *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 822 F.Supp. 227 (E.D.Pa.1993). The Court of Appeals for the Third Circuit reversed, holding that the Supreme Court did not intend to allow further proceedings on the merits of the case. *Casey*, 14 F.3d 848, 863 (3d Cir.1994). The court of appeals did keep alive the possibility of a later as-applied challenge after the law had gone into effect. *Id.* ("[W]e read the Court's opinion to permit a future challenge to the Pennsylvania Act in another case after the Act goes into effect."). Plaintiffs applied to Justice Souter for a stay of the court of appeals' decision pending a petition for writ of certiorari. Justice Souter denied the application, but agreed with the Third Circuit that plaintiffs or other litigants

were free to mount an as-applied challenge after the law had gone into effect. *Casey,* 510 U.S. at 1311 n. 3, 114 S.Ct. at 910 n. 3. More important for purposes of this case, Justice Souter said that "litigants are free to challenge similar restrictions in other jurisdictions...." *Id.* at 1313, 114 S.Ct. at 911. The Third Circuit had said much the same thing. *Casey,* 14 F.3d at 861 ("At a minimum, we believe the Court meant that other state abortion laws require individualized application of the undue burden standard."); *see also Schafer,* 507 U.S. at 1014, 113 S.Ct. at 1669 (O'Connor, J., concurring in denial of stay) (lower courts should have examined factual record specifically in determining whether law created undue burden).

Shortly after *Casey,* the Court of Appeals for the Fifth Circuit decided that fact-finding was unnecessary in a challenge to a Mississippi law similar to that found constitutional in *Casey. See Barnes,* 970 F.2d at 15 (differences between Mississippi and Pennsylvania acts not sufficient to render Mississippi law unconstitutional and further evidentiary proceedings would not affect that conclusion). The court rejected plaintiffs' argument that differences between Mississippi and Pennsylvania warranted new factual inquiries in Mississippi, refusing to engage in what it called plaintiffs' "Mississippi ain't Pennsylvania" rationale. *Id.* at 15 n. 5. The United States District Court for the District of Utah was even more critical of an attempt to distinguish Utah from Pennsylvania in a challenge to Utah abortion regulations, going so far as to impose sanctions on plaintiffs for even attempting to make the argument. *See Utah Women's Clinic, Inc. v. Leavitt,* 844 F.Supp. 1482, 1495 (D.Utah 1994) ("Because of the absence of merit in support of plaintiffs' case and the legal frivolousness of plaintiffs' assertions in this facial challenge, plaintiffs are ordered to pay defendants' costs and attorney fees.") *reversed and remanded for reconsideration,* 75 F.3d 564 (10th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 2551, 135 L.Ed.2d 1070 (1996).

In upholding a North Dakota law similar to Pennsylvania's, the Court of Appeals for the Eighth Circuit did look at the factual evidence of the burdens imposed on certain women by a two-trip requirement. *Fargo Women's Health Org. v. Schafer,* 18 F.3d 526, 532–33 (8th Cir.1994). However, because the Eighth Circuit read the North Dakota law as permitting the delivery of the informed consent information over the phone, it did not need to get into a detailed analysis of those burdens. Without a two-trip requirement, the law did not impose an undue burden. *Id.* at 533; *see also Miller,* 63 F.3d at 1467 (South Dakota's informed consent law is constitutional for same reasons North Dakota law is constitutional: it is substantially similar to Pennsylvania law in *Casey* ).

Although the issue is not free from doubt, I am persuaded that *Casey* does not foreclose facial challenges to similar laws in other states. Even Justice Scalia's criticism of the *Casey* joint opinion shows that he believes *Casey* leaves available an opportunity for litigation. Not all states are like Pennsylvania. Differences exist in the number of abortion providers, the distances that women must travel to arrive at abortion facilities and the average income level of the state's citizens. All these factors may contribute to a finding that a burden that is not undue in Pennsylvania is undue under the factual circumstances of another state. For example, the United States District Court for the District of South Dakota made factual findings that South Dakota had only a single abortion provider, that 17% of South Dakota women travel 300 miles to obtain an abortion and that 25% of the plaintiff doctor's patients were below the federal poverty level. *Planned Parenthood, Sioux Falls Clinic v. Miller,* 860 F.Supp. 1409, 1415 (D.S.D.1994), *aff'd,* 63 F.3d 1452 (8th Cir.1995), *cert. denied sub nom. Janklow v. Planned Parenthood, Sioux Falls Clinic,* — U.S. —, 116 S.Ct. 1582, 134 L.Ed.2d 679 (1996). Although the Court of Appeals for the Eighth Circuit found the South Dakota law did not impose an undue burden, in large part because the law permitted the distribution of information to be given over the telephone and therefore did not require two trips, the South Dakota facts show that the Pennsylvania factual predicates are not applicable to all states. *See Miller,* 63 F.3d at 1467.

Nonetheless, on a facial challenge it will be difficult to introduce convincing proof that a regulation similar to the one upheld in *Casey* will impose an undue burden in one state when it did not impose such a burden in Pennsylvania. Lower federal courts are bound by Supreme Court precedent and are justifiably hesitant to reach a conclusion directly at odds with that of the Supreme Court. It is not surprising that virtually every court to consider a challenge to a state regulation resembling the one upheld in *Casey* has found the regulation constitutionally valid. The nature of a facial challenge is such that plaintiffs will never have conclusive evidence that the law imposes an undue burden on women in a particular state who are not yet subject to the law. The evidence will always be based on facts about the provision of abortion before the law has taken effect and on comparisons that may be drawn from the experiences of other states with similar laws. As-applied challenges would have more concrete statistics about the law's actual effect in that state. Of course, the problem with an as-applied challenge is that some women must be affected adversely under the law before the evidence becomes concrete enough to show that the law is truly an undue burden.

Plaintiffs' facial challenge deserves close scrutiny. Plaintiffs have a high burden, but it is not necessarily an insurmountable one. To show that AB 441 has an unconstitutional effect, they must prove that the differences between the laws and the factual circumstances of Wisconsin and those of Pennsylvania, coupled with information from other states, are such as to establish that AB 441 will impose an undue burden on Wisconsin women.

Before addressing plaintiffs' evidence of the effects AB 441 will have on Wisconsin women, it is necessary to discuss another method by which plaintiffs might prove the unconstitutionality of AB 441: showing that the legislature had an impermissible purpose in passing the law.

c. Role of impermissible purpose in undue burden standard

As discussed above, a law may impose an undue burden if it has the "*pur-pose* or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. at 2820 (emphasis added). A statute has such an unconstitutional purpose if the legislature chose means intended to hinder a woman's choice rather than inform it. *Id.* A state measure designed to persuade women to choose childbirth over abortion does not harbor an impermissible purpose if the measure is reasonably related to that goal. *Id.* at 878, 112 S.Ct. at 2821. Apprising women of the health risks of abortion and providing them information about the fetus that is truthful and not misleading furthers a legitimate state purpose. *Id.* at 882, 112 S.Ct. at 2823.

In *Casey*, the Court did not make clear what type of inquiry courts should conduct to determine whether a regulation had the "purpose" of imposing an undue burden on a woman's right to seek an abortion. The Court seemed to believe that Pennsylvania did not have such a purpose in passing its abortion legislation and did not subject the Pennsylvania law to a searching purpose inquiry. The absence of any detailed discussion of the purpose prong of the undue burden test in *Casey* signals the considerable difficulty of mounting a credible challenge to an abortion law on the premise that the law harbors an impermissible purpose, even if the law's provisions are medically unnecessary. To see why this is so, one need look no further than the Court's determination that a state has legitimate interests from the outset of pregnancy in persuading women to choose childbirth over abortion and in informing women of the health risks of the procedure. The Court's antipathy to a purpose argument is also evidenced in its rejection of Justice Stevens's position that a "state-imposed burden on the exercise of a constitutional right is measured both by its effects and by its character: A burden may be 'undue' either because the burden is too severe or because it lacks a legitimate, rational justification." *Casey*, 505 U.S. at 920, 112 S.Ct. at 2842–43 (Stevens, J., concurring in part and dissenting in part).

Under *Casey,* a state can take many steps to discourage abortions as long as it does not attempt to prevent women from having them. The distinction between discouragement and prevention is subtle. If legislatures are not blatantly careless about the fine line, they will be able to structure their legislation in terms of dissuasion rather than prohibition and thereby avoid the prohibited purpose of making abortions more difficult to obtain.

■ Of course, a state's asserted legislative purpose is not necessarily the purpose that a court will find upon closer inspection. A court does not have to accept a state's alleged purpose if it is a "sham," *see Edwards v. Aguillard,* 482 U.S. 578, 587, 107 S.Ct. 2573, 2579, 96 L.Ed.2d 510 (1987), or is not reasonable given the underlying circumstances of the law's passage, but proper respect for a coequal branch of government dictates that courts should be hesitant to cast aside the stated legislative purpose in favor of a hidden purpose that the court discerns. *See Mazurek v. Armstrong,* —— U.S. ——, ——, 117 S.Ct. 1865, 1867, 138 L.Ed.2d 162 (1997) ("We do not assume unconstitutional legislative intent even when statutes produce harmful results") (citing *Washington v. Davis,* 426 U.S. 229, 236, 96 S.Ct. 2040, 2046, 48 L.Ed.2d 597 (1976)); *Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 469–70, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (inquiries into congressional motives or purposes are hazardous matters; search for primary purpose of legislation is likely elusive); *State v. Carpenter,* 197 Wis.2d 252, 269, 541 N.W.2d 105, 111–12 (1995) ("Our task is not to search for sinister ulterior motives underlying the legislature's acts in order to find statutes unconstitutional.").

The Supreme Court discussed the issue of impermissible purpose briefly in *Armstrong,* —— U.S. ——, 117 S.Ct. 1865, an opinion released this month. The Court reversed a decision by the Court of Appeals for the Ninth Circuit vacating a district court's denial of a motion to preliminarily enjoin a Montana law that restricted the performance of abortions to licensed physicians, thereby excluding physicians' assistants from performing them. *Id.* at ——, 117 S.Ct. at 1869. The court of appeals had vacated and remanded the case to the district court because it believed the district court had taken an unduly narrow view of the purpose element of the *Casey* undue burden test in assessing whether to grant the preliminary injunction. *Armstrong v. Mazurek,* 94 F.3d 566, 567 (9th Cir.1996).

In *Armstrong,* the Supreme Court did not say that an impermissible purpose argument could never be made in challenging abortion regulations but its decision suggests that a successful showing will be rare. The Court rejected the argument that the lack of evidence that the Montana law would protect women's health showed that the law was based on an impermissible purpose. —— U.S. at ——, 117 S.Ct. at 1867. The Court relied on *Casey* for the proposition that states have broad latitude to determine when licensed professionals should perform certain tasks even if others could perform those tasks just as well. *Id.* (citing *Casey,* 505 U.S. at 885, 112 S.Ct. at 2824–25). In addition, the Court held that the involvement of anti-abortion groups showed nothing significant about the legislature's purpose in the passage of the legislation. *Id.*

Although the Supreme Court overruled the Court of Appeals for the Ninth Circuit in *Armstrong,* it denied certiorari in *Jane L. v. Bangerter,* 102 F.3d 1112, 1116 (10th Cir. 1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2453, 138 L.Ed.2d 211 (1997), a case in which the Court of Appeals for the Tenth Circuit court had struck down a Utah law that narrowly restricted abortions after 20 weeks' gestational age on the ground that the law had both the purpose and effect of usurping the physician's responsibility for determining fetal viability. *Id.* at 1116–17. The Court's denial of certiorari does not necessarily indicate agreement with the court of appeals' opinion, but given the extreme circumstances of *Bangerter* it is likely that the Court would agree with the reasoning. The court of appeals had found that the Utah legislature had made a deliberate decision to disregard controlling Supreme Court precedent that protected a woman's right to choose up to the point of viability, which was a point to be determined by a physician on an individual basis, not by the legislature on a set 20-week

schedule. The court found evidence of the state's intent in the state's appellate briefs, in which the state conceded that the purpose of the statute was to prevent abortions of nonviable fetuses after 20 weeks' gestational age because "in the State's view women who seek such abortions have waited too long." *Id.* at 1117.

It was not difficult for the Court of Appeals for the Tenth Circuit to reach a finding of an impermissible purpose in *Bangerter*: the state had admitted its improper motive. However, the state of Wisconsin has not made such an admission in this case. After the Supreme Court's recent decision in *Armstrong,* ⸺ U.S. ⸺, 117 S.Ct. 1865, the impermissible purpose prong of the undue burden test appears almost impossible to prove in the absence of a confession like that in *Bangerter*.

Although neither *Casey* nor *Armstrong* sets out the standards the Court would require for a successful impermissible purpose argument, the Court's decisions in other areas offers some guidance on the test the court might apply. *See* Gillian E. Metzger, Comment, *Unburdening the Undue Burden Standard: Orienting Casey in Constitutional Jurisprudence,* 94 Colum. L. Rev. 2025 (suggesting a number of comparisons that can be drawn between the undue burden test and other areas of the Supreme Court's jurisprudence). In looking for a forbidden purpose in both voting rights and establishment clause cases, the Court has relied on legislative history, the social and historical context of the legislation, the events leading up to the law's enactment and previously existing laws concerning the same topic. *See Shaw v. Hunt,* ⸺ U.S. ⸺, ⸺–⸺, 116 S.Ct. 1894, 1899–1901, 135 L.Ed.2d 207 (1996) (voting rights case); Metzger, *supra,* at 2074–75 (discussing establishment clause cases). If an impermissible purpose is uncovered, the Court then analyzes whether that purpose was the "predominant," *Miller v. Johnson,* 515 U.S. 900, 915–16, 115 S.Ct. 2475, 2488, 132 L.Ed.2d 762 (1995), "animating," *Edwards,* 482 U.S. at 585, 107 S.Ct. at 2578, or "actual," *Wallace v. Jaffree,* 472 U.S. 38, 56, 105 S.Ct. 2479, 2489–90, 86 L.Ed.2d 29 (1985), one driving the legislation.

In analyzing plaintiffs' argument that AB 441 is unconstitutional because it harbors an unconstitutional purpose, the starting point is to look to the law's structure and the totality of circumstances surrounding its passage in an attempt to discern whether the legislature's purpose was to prevent women from receiving abortions. Only if it appears that the legislation had an impermissible purpose, will it be appropriate to see whether that purpose was the "predominant" one behind the passage of AB 441.

3. *Application of the undue burden standard*

a. Application of the purpose prong

According to plaintiffs, the state's impermissible purpose in passing AB 441 is evident in both the structure and the circumstances surrounding the passage of the law. Plaintiffs' evidence consists of: 1) a series of amendments to the law that were rejected by the legislature; 2) summaries of a public hearing and an executive session of the assembly committee that considered AB 441; 3) a list of the pro-life groups that supported the legislation and the women's health groups that opposed it; and 4) testimony from defendants' own expert witness that the previous law in Wisconsin was adequate to obtain a woman's informed consent to abortion.

1) amendments

Plaintiffs allege that the legislature rejected a number of amendments to AB 441 that would have lessened the burdens of the law on women. They contend that the legislature's failure to adopt these amendments evidences its impermissible motive. Among the rejected amendments are provisions that would have deleted the "in person" requirement, would have allowed the state materials to be given orally rather than in writing and would have exempted women pregnant as a result of sexual assault or incest. Plaintiffs cite a number of other amendments, but it is not necessary to list them all. These rejected amendments do not show that the legislature had an impermissible purpose in passing AB 441. Legislators reject amendments for a variety of reasons. Reading a single illicit

motive into the rejection of an amendment would be an act of legislative mind reading that courts are not capable of performing. Moreover, the lack of any evidence containing legislators' explanations for rejecting the proposed amendments makes it virtually impossible to impute any type of legislative purpose to the rejection of an amendment.

### 2) summaries of public hearing and executive session

 The summaries of the public hearing and the assembly committee's executive session considering AB 441 are the subject of a subsidiary dispute in this case. The summaries, prepared by Anne Sappenfield, staff attorney for the Wisconsin Legislative Council, record Sappenfield's recollection of the testimony at a July 27, 1995 public hearing on AB 441 and of the statements made by those attending the August 24, 1995 executive session of the assembly committee on Children and Families. Defendants object to the admission into evidence of these documents (Plaintiffs' exhibits 34–36) on the ground that they contain Sappenfield's notes of out of court statements that plaintiffs are offering to prove an impermissible legislative purpose. Plaintiffs argue that the documents are records of a public office setting forth the activities of that office and are therefore admissible under the hearsay exception in Fed.R.Evid. 803(8)(A).

The summaries are sufficiently reliable to be admissible under Fed.R.Evid. 803(8)(A), but they do not advance plaintiffs' case. The summary of the public hearing contains notes of statements made by AB 441's authors, representative Glenn Grothman and senator Gary Drzewiecki, as well as questions posed by a number of other legislative members about the bill. Nothing in the notes indicates that Grothman or Drzewiecki intended to prevent women from having access to abortions rather than seeking to encourage childbirth over abortion and to promote informed decisionmaking. Grothman and Drzewiecki may believe that abortion should be made illegal and may want to make abortions more difficult to obtain, but the notes of the public hearing do not indicate that is what AB 441 was intended to do. The summary of the

executive committee meeting is equally unavailing to plaintiffs' purpose arguments. There is a cryptic reference on the last page of Sappenfield's handwritten summary of the executive committee session to a statement by representative Young that she believed the objective of AB 441 was to raise obstacles for women seeking abortions, but the fact that one legislator read such a potential goal into the legislation does not render it constitutionally invalid. Anyone looking at AB 441 in any detail could reach the same conclusion as representative Young.

### 3) interest groups

 Plaintiffs attempt to show improper purpose by bringing to the court's attention that the legislative sponsors of AB 441 garnered support from anti-abortion groups such as Wisconsin Right to Life, the Wisconsin Catholic Conference and the Wisconsin Council of Catholic Women. The Supreme Court's explanation in *Armstrong*, —— U.S. at ——, 117 S.Ct. at 1867, that the involvement of anti-abortion groups in drafting legislation has no relevance to the legislature's purpose renders this argument moot.

### 4) previous informed consent law

 Plaintiffs' last argument with respect to the purpose prong is that prior to AB 441 Wisconsin had in place another abortion informed consent law that was adequate to insure informed consent for a woman obtaining an abortion. Defendants' expert on informed consent, Dr. John Gianopoulos, said as much. Under the previous informed consent law, Wis. Stat. § 253.10 (repealed 1996), physicians had to tell their patients whether they were pregnant, inform them of the gestational age of the fetus, communicate the risks of the pregnancy and the abortion procedure to be employed, and advise them of the availability of agencies offering birth control information and assistance if the woman decided not to have an abortion. There were no waiting periods, no requirements that doctors physically give out state-printed materials about the anatomical and physiological characteristics of the fetus, no provisions that doctors inform their patients of the risk of "psychological trauma" associated with abortion and no mandates that the physician gar-

ner the informed consent of patients "in an individual setting."

The changes pose a legitimate question concerning the legislature's motive. If the previous statute was sufficient and the new one does exactly what the old one did but adds a number of provisions that make it more difficult for women to receive abortions, did the legislature act with an impermissible purpose? Defendants' first response to this question is that the legislature explained its reasons for the new law in the legislative findings section of the statute and it is not the court's prerogative to question those stated findings. In the legislative findings, the drafters say that the legislature determined that the state has a legitimate concern in guaranteeing that a woman's decision is informed, that under the prior law women were not receiving adequate personal counseling from the doctors who were performing abortions and that a reasonable waiting period would help to insure that a woman had the fullest opportunity to give her informed consent to the procedure. In addition, defendants point out that Dr. Gianopoulos did not testify that the additional requirements were not sound medical practice or that they would not benefit patients.

Although there is some merit to plaintiffs' argument that AB 441 was unnecessary to protect women's health and reflects nothing more than a desire to prevent women from obtaining abortions, it cannot overcome the Supreme Court's holding in *Casey* that legislation is based on a permissible purpose if it is reasonably related to promoting childbirth over abortion or protecting maternal health. *Casey*, 505 U.S. at 878, 112 S.Ct. at 2821. The changes brought about by AB 441, including the 24–hour waiting period, the requirement that physicians rather than abortion counselors provide informed consent information and the requirement that physicians distribute the information "in person" rather than being allowed to do so over the telephone are of dubious medical value. However, I cannot say that these provisions bear no reasonable relationship to the state's goals of promoting childbirth over abortion. The waiting period serves the state's goal of providing women more time to contemplate the abortion decision. The Supreme Court has held that the state has broad latitude to determine when licensed professionals rather than others should be treating the public; this latitude encompasses the decision that physicians instead of counselors provide information. *See Armstrong*, —— U.S at ——, 117 S.Ct. at 1867. Requiring women to make a preliminary visit in person allows physicians to conduct physical examinations of their patients to determine the gestational age of the fetus and to tailor the informed consent discussion accordingly. Moreover, the Supreme Court reviewed similar provisions in the Pennsylvania law and did not find that they revealed an impermissible legislative purpose.

Were *Casey* not binding, I might be inclined to hold that AB 441 was passed with an impermissible purpose, given the absence of any apparent medical benefits in the new legislation, the acknowledgment by Dr. Gianopoulos that the previous law adequately informed women about the risks of abortion, the imposition of a two-trip requirement that will greatly increase the cost and difficulty of obtaining an abortion and make women far more vulnerable to harassment by anti-abortion protesters, and the evident effort of the legislature to impose requirements on physicians that will reduce the number of abortions they can perform, increase their risk of being sued or losing their licenses and add to the expenses of their practices. However, lower courts are bound by Supreme Court precedent. I do not see how *Casey* does not control this question.

b. Application of the effects prong

In examining whether AB 441 has the unconstitutional effect of imposing an undue burden on a "large fraction" of women for whom the law is relevant, I will follow the Court's approach in *Casey* of segmenting the challenged statute into component parts and analyzing the expected effect of each provision separately. AB 441 has three parts that plaintiffs contend will create substantial obstacles for women seeking abortions: the 24–hour waiting period; the provision of in-

formed consent information; and the medical emergency provision.

### 1) 24–hour waiting period

■ According to plaintiffs, AB 441 effectively imposes a two-trip requirement on women who want to obtain abortions because women must come first to an abortion provider to receive the informed consent information and then return again the next day or at some later time to undergo the abortion procedure itself. Plaintiffs suggest that this will mean overnight stays for women who live far from abortion facilities, increased travel expenses for all women, heightened problems for women who have difficulties explaining their absences to abusive partners or inquisitive employers and unhealthy psychological suffering for women who have been sexually assaulted. Defendants acknowledge that AB 441 prescribes a 24–hour waiting period, but contend that the two-trip requirement is a chimera created by plaintiffs to make AB 441 look more onerous than it really is. Defendants point out that AB 441 contains a provision that allows women to receive the initial informed consent information from a "qualified physician," Wis. Stat. § 253.10(3)(c)1, and argue that because there are physicians who would be "qualified" to provide this information in virtually every county in the state, the waiting period between the first and second visits does not pose a substantial obstacle to women seeking abortions.

### a) two-trip requirement

Before analyzing any potential burdens imposed by the 24–hour waiting period, it is necessary to determine whether AB 441 requires two trips to an abortion provider. Defendants argue that there is no such requirement because the statute permits a "qualified physician" to provide the initial information necessary for informed consent. Wis. Stat. § 253.10(3)(c)1. However, it is unclear exactly how a physician becomes "qualified" to provide this information. The statute defines "qualified physician" as "a physician who by training or experience is qualified to provide the information required under sub. (3)(c)1." § 253.10(2)(g). The definition is decidedly unhelpful to physicians trying to determine whether they fall within

its bounds. It does not specify what training and experience would lead one to become "qualified" and the statute itself does not set up any licensing program to verify which physicians are "qualified."

Thus, although AB 441 provides women who live at great distances from an abortion provider the option of visiting a physician close to home, that option may be an empty promise. As the testimony of the parties' expert witnesses revealed, there is little unanimity about what the statute means by a "qualified physician." Given these uncertainties, there is little reason to credit the testimony of defendants' witness, Stephen Tanner, that qualified physicians (defined in a survey he undertook as any primary care physician who specializes in Internal Medicine, Obstetrics/Gynecology, Pediatrics, General Practice or Family Practice) could be found in all but three counties of the state. Tanner could not say that the physicians he counted in his survey would be qualified under the statute, let alone willing to participate.

In addition to creating uncertainty for physicians who are trying to decide whether they are "qualified," the definition leaves the state's abortion providers guessing about which doctors they can rely on to gather informed consent. As a consequence, the abortion providers will have to repeat the informed consent procedures even when a patient has received that information elsewhere, simply to insure that they will not be held liable for relying on an unqualified physician. Defendants underestimate the legitimacy of plaintiffs' concern when they suggest that plaintiffs should not worry because the state would never prosecute plaintiffs for relying on another doctor in the absence of an explicit procedure for determining who was "qualified." Plaintiffs have good reason to be concerned. The penalties for violating AB 441 are stiff, including the potential revocation of the physician's license. In the face of this uncertainty, it is not reasonable to think that doctors would rely on other, unknown physicians when their medical licenses are on the line.

It is likely that in practice AB 441 will require two trips to an abortion provider.

However, it does not follow from this that the statute is unconstitutional. The Pennsylvania version of AB 441 included a two-trip requirement and was held constitutional. *See Casey*, 505 U.S. at 886, 112 S.Ct. at 2825 (interpreting Pennsylvania law to require two visits to doctor); *Casey*, 744 F.Supp. at 1351 (24–hour waiting period will require minimum of two trips to abortion provider). Unless plaintiffs can show that the Wisconsin two-trip requirement would be more burdensome than the Pennsylvania two-trip requirement because of the different demographics of the states or because of new data garnered from other states in the years since *Casey* was decided, *Casey* requires a finding that AB 441's two-trip requirement is constitutional.

b) demographic differences between Pennsylvania and Wisconsin

The demographics of Pennsylvania and Wisconsin are not the same, but the differences are not significant enough to suggest a different outcome for Wisconsin's 24–hour waiting period. Wisconsin's abortion providers are located either in southern Wisconsin (Madison and Milwaukee) or in the east central part of the state (Appleton and Green Bay). These clinics provide abortions primarily to women from the southern half of Wisconsin. In 1994, 87% of Wisconsin women having abortions traveled less than 74 miles to a clinic. The women in the northern half of the state must travel considerable distances to come to one of the state's abortion clinics. The length of travel is eased somewhat by the presence of abortion clinics in Duluth and St. Paul, Minnesota, but those clinics are not necessarily more convenient for women in north central or northeastern Wisconsin. A 24–hour waiting period will almost certainly require an overnight visit and increased expenses for women living in northern Wisconsin.

As in every state, poor women are affected more than others because they are less able to absorb the increased costs of travel. At present, the initial visit to a Wisconsin abortion provider would be covered by Medicaid, but that is subject to legislative change at any time, and, in any case, Medicaid does not cover the costs of child care or lost wages. Nonetheless, in *Casey*, the Court did not find that the 24–hour waiting period would be an undue burden on poor women. In fact, it mentioned explicitly that it expected the waiting period to increase the cost of abortions and that such an increase would not constitute an undue burden. *Casey*, 505 U.S. at 886, 112 S.Ct. at 2825. Plaintiffs did not offer any evidence showing that the waiting period would impose a greater burden on abused or poor women in Wisconsin than it did in Pennsylvania.

If I were writing on a blank slate, I would have no difficulty concluding that the 24–hour waiting period imposes a significant obstacle amounting to an undue burden on women seeking abortions in Wisconsin. But the slate is not blank: it has the Supreme Court's *Casey* holding etched upon it. *Casey* upheld the 24–hour waiting period even though the district court found that it would require a minimum of two trips, would subject many women to the harassment and hostility of anti-abortion protesters on two separate occasions, would result in delays of far more than 24 hours and would require a number of women to stay overnight at a location near the abortion facility, thereby increasing the costs of the abortion and requiring them to miss an additional day of work. *Casey*, 744 F.Supp. at 1351–52. I cannot say that the waiting period would be so much more burdensome in Wisconsin that *Casey* does not apply. Forty-two percent of the women seeking abortions in Pennsylvania had to travel at least an hour and sometimes longer than three hours to obtain their abortions. *Id.* at 1352. The travel times for women in northern Wisconsin may be longer, but the differences in travel time do not render AB 441's 24–hour waiting period unconstitutional.

Nonetheless, as I have explained already, challengers of abortion regulations may be able to show that what was not an undue burden in Pennsylvania is an undue burden elsewhere. It is difficult to do this with pure demographic data, but it might be possible with concrete statistical evidence that a similar waiting period law caused abortions to decline, not because women were persuaded

to continue their pregnancies but because of their inability to make two trips to an abortion provider.

### c) statistical surveys of data pertaining to Mississippi abortion waiting period law

■ Each side called an expert witness to explain the statistical analyses he had made of the experience in Mississippi after the state's 24–hour waiting period, two-trip law went into effect on August 8, 1992. Plaintiffs expert, Dr. Stanley Henshaw, deputy director of the Alan Guttmacher Institute in New York, conducted several statistical studies that showed an 11 to 13% decline in the number of Mississippi women who reported abortions both in and out-of-state after the law became effective. In addition, the studies showed that the number of Mississippi women having their abortions before nine weeks' gestation declined 25% and the number of Mississippi women going out of state for abortions increased at least 17%. Defendants countered Dr. Henshaw's testimony with an expert of their own, Dr. Peter Uhlenberg, professor of sociology at the University of North Carolina, who testified that while these trends may be present, they cannot be attributed to the August 8, 1992 implementation of the law. According to Dr. Uhlenberg, the trend of declining abortions began in April 1992, thereby negating any causal effect attributable to the waiting period law.

Both Dr. Henshaw's and Dr. Uhlenberg's testimony meets the standards for scientific testimony under Fed.R.Evid. 702. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (courts have independent duty to undertake two-pronged inquiry, verifying both that the expert is proposing to testify to "scientific knowledge" and that such testimony "will assist the trier of fact to understand or determine a fact in issue"). Statistical studies are subject to scrutiny under the *Daubert* test just like any other scientific evidence. *See People Who Care v. Rockford Bd. of Education, School Dist. No. 205*, 111 F.3d 528, 536 (7th Cir.1997); *Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir.1996), *cert. denied*, —— U.S.

——, 117 S.Ct. 2409, 138 L.Ed.2d 175 (1997). The methods an expert employs to reach his opinion must be at least as precise as the methods his profession would require for out-of-court research. *People Who Care*, 111 F.3d at 536; *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997) (expert must be as careful in testimony to court as she would be in regular professional work).

Henshaw and a colleague, Frances A. Althaus, conducted a statistical study on data concerning the number of abortions taking place in Mississippi and surrounding states in 1992. They compared the first seven months of 1992 to the last five months of 1992, attempting to see whether the August 8, 1992 implementation of the abortion waiting period law had any effect on such things as the number of abortions performed in the state, the number of Mississippi residents having abortions in Alabama and Tennessee, the number of out-of-state residents having abortions in Mississippi, the number of Mississippi residents with more than twelve years' education having abortions, the number of Mississippi residents with less than twelve years' education having abortions, the number of Mississippi residents having abortions at less than nine weeks' gestation and the number of Mississippi residents having abortions after twelve weeks' gestation. In addition, Henshaw and Althaus looked at race and distance from abortion providers. In order to calculate the expected number of abortions for the last five months of 1992, Henshaw and Althaus multiplied the number of abortions in the first five months by .650, a ratio developed by comparing the first seven months of 1990, 1991 and 1993 to the last five months in each of those years.

The study revealed that Mississippi residents had 13% fewer abortions in the last five months of 1992 than what would have been expected using 1990, 1991 and 1993 figures. Henshaw acknowledged that the 13% rate probably needed to be adjusted to around 11% because he had no statistics on the number of Mississippi residents having abortions in Louisiana. (Henshaw did have figures on the number of Mississippi women receiving abortions in Alabama and Tennes-

see.) Henshaw and Althaus found that the number of Mississippi residents having abortions before nine weeks' gestation was 25% less than expected and the number of Mississippi residents going to Alabama and Tennessee for abortions increased 17%.

The Henshaw and Althaus study did not find any significant correlation between the decline in the number of abortions in Mississippi and either race or distance from an abortion provider. A finding of no correlation between race and a decline in the abortion rate tends to indicate no correlation between income level and a decreased number of abortions. (Henshaw acknowledged that black women tend to be poorer than white women in Mississippi.)

The Henshaw and Althaus study has certain shortcomings. First, it lacks information about the number of Mississippi women having abortions in Louisiana. Although Henshaw attempted to control for this problem by reducing the decline in abortions figure from 13% to 11%, it is not certain that this is a sufficient decrease. Early in 1992, the sole abortion facility in southern Mississippi closed. (Or at least stopped reporting that it was doing abortions. There is some uncertainty whether the operation was shut down completely.) This means that a number of women in southern Mississippi who would have otherwise gone to the southern Mississippi clinic probably went to a clinic in Metairie, Louisiana, just outside New Orleans. Although the number of reported abortions for Mississippi residents in January and February 1992 did not decline as might be expected if the southern Mississippi clinic were no longer open, the closing of that clinic makes any estimate of the number of Mississippi residents getting abortions in Louisiana highly speculative.

Another minor problem in the Henshaw study is the use of 1993 figures to contribute to the .650 ratio used to predict the number of abortions in the last five months of 1992. It does not make sense to use data from a period subsequent to the implementation of the law to predict the law's effect. The parties do not make dear how much of an effect the use of the 1993 data had on the

ratio, although Dr. Uhlenberg testified that it was not a major flaw.

The last and possibly most serious shortcoming in Henshaw's study is the failure to control for the persuasive effect of the law. If the number of abortions reported for Mississippi residents declined because the waiting period law was persuading women not to have abortions, there would be no constitutional problems. *Casey* has made it plain that states can pass laws designed to "express profound respect for the life of the unborn" and to guarantee that a woman's decision is well-informed, as long as those laws do not impose an undue burden on women's right to choose. *Casey*, 505 U.S. at 877, 112 S.Ct. at 2820–21. Henshaw was satisfied that the decline did not come from the persuasiveness of the law. In telephone conversations with the directors of two of the three abortion providers in Mississippi, he had learned that women almost invariably returned for a second visit after making the initial visit and his study showed that the number of Mississippi women going to other states to have abortions had increased while the number of out-of-state women coming to Mississippi to obtain abortions had declined. However, the reliability of the telephone conversations is questionable. The conversations offer evidence of the directors' recollections of what has occurred rather than objective statistical data.

Dr. Uhlenberg began his studies of the 1992 data with the presumption that there may have been factors operating in Mississippi in that year other than the August 8 implementation of the abortion waiting period law that led to the diminished figures observed by Henshaw. After determining that the numbers from the first quarter of 1992 did not provide an accurate prediction of the numbers from the second quarter of that year, Uhlenberg decided that Henshaw's method of looking at data from the entire year would not produce reliable statistical results. Instead, Uhlenberg thought it would be more accurate to use numbers from the second quarter of 1992 to predicts the last four months of the year. Uhlenberg excluded July and August because he believed that some women might have moved

their abortions up to July in anticipation of the implementation of the Mississippi law and that August would give skewed results because that was the month the law into effect. Using this analytical framework, Uhlenberg found no statistically significant decline in the number of abortions for Mississippi women in the last four months of 1992 that could be linked to the implementation of the abortion waiting period law.

Uhlenberg's method is suspect for excluding both July and August. These months contain important data. It seems unlikely that women would have advanced their abortions to July in anticipation of the law going into effect. To make this assumption, one has to believe that Mississippi women noted the *Casey* decision when it was released on June 29, 1992, calculated that the Mississippi court would lift its injunction shortly thereafter in response to *Casey* and called abortion clinics immediately to schedule appointments so as not to have to undergo the burden of going to a abortion provider twice. Such a proposition is highly dubious.

Uhlenberg's exclusion of August is questionable also. The injunction was lifted near the beginning of the month; only seven days elapsed while the injunction was in effect. August could have been included with the last four months of 1992 in Uhlenberg's model. If anything, one would expect August to be skewed in Uhlenberg's favor because the month would include figures representing the abortions obtained during the week the old law was in effect when women had to make only a single trip.

In addition to performing statistical surveys using 1992 data only, Henshaw and Uhlenberg conducted a series of regression analyses employing data from 1991 through 1993. Henshaw's tests continued to show a decline in the number of abortions for Mississippi residents after the August 1992 intervention date, whether he used a one-tail or a two-tail test for statistical significance. Using April 1992 as an intervention date, Uhlenberg's regression analyses showed a statistically significant drop in the number of abortions after that month when he employed a one-tail test but not when he used a two-tail test.

Henshaw's analysis and results are more credible than Uhlenberg's. Uhlenberg's approach to the 1992 data is suspect for excluding July and August and Henshaw's replications of Uhlenberg's work indicate that there is little reason to exclude the first quarter of 1992 from consideration. Uhlenberg's regression analyses using April 1992 as an intervention date are less reliable than Henshaw's August 1992 intervention date analyses because they show statistical significance only when a one-tail test is used. Henshaw's work showed statistical significance for August 1992 under both a one-tail and a two-tail test.

The question is whether those results establish that the 24–hour waiting period and two-trip requirement are such substantial obstacles that they prevent some women from obtaining abortions. The answer is unclear. Henshaw's data show a decline in abortions but do not explain the reason for the decline. If the drop corresponded to race (poverty) or to distance from providers, one would have some confidence in concluding that the two-trip requirement was an undue burden for poor women living far from a provider. Without this expected correlation, one can only speculate that the additional trip is an insurmountable obstacle, rather than merely a less desirable option. Henshaw's reports of the experience of Mississippi clinics tend to corroborate his conclusion that the decline is not attributable to persuasion and his conclusion is corroborated further by North Dakota's experience of no significant decline in the number of its residents obtaining abortions within the state after it began providing state-mandated information over the telephone and by the increase in Mississippi women seeking out-of-state abortions. Even so, it is questionable whether one can conclude that the drop in abortions is attributable to the difficulties of making two trips rather than to something else. Clearly the increase in Mississippi women going out of state and the decline in out-of-state women coming to Mississippi show a preference for avoiding the two-trip requirement. I question whether it is possible to conclude that the 11% drop that Henshaw observed is not the result of similar preferences. In the

absence of information about abortions obtained in Louisiana, which is the natural option for women living in southern Mississippi, it is risky to draw conclusions about the reason for the drop in Mississippi abortions and even riskier to apply that experience to Wisconsin. In sum, I cannot conclude from the statistical evidence of the Mississippi experience that plaintiffs have shown that in a "large fraction of the cases" in which AB 441 is relevant, it "will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895, 112 S.Ct. at 2830.

### 2) informed consent provisions

AB 441 provides that an abortion may not be performed unless a woman has given her voluntary and informed written consent to the procedure. Wis. Stat. § 253.10(3)(a). Except for cases involving medical emergencies, a woman's consent is not "informed" unless the physician who will be performing the abortion or another qualified physician at least 24 hours before the abortion is to be performed has informed the woman of a number of factors, the specifics of which can be found in the Facts section of this opinion. Physicians or qualified assistants must disseminate two categories of oral information as well as a package of state-printed written materials to women in an "individual setting." *See* Wis. Stat. § 253.10(3)(c)3.

Plaintiffs contend that two elements of this required information have the effect of imposing an undue burden on a woman's right to obtain a previability abortion because they require the distribution of information that is false and misleading and therefore hinder rather than inform the woman's choice. *See Casey*, 505 U.S. at 882, 112 S.Ct. at 2823 (information that state requires to be made available must be "truthful and not misleading"). Plaintiffs argue that: 1) requiring physicians to explain to a woman that the father of the child is liable for assistance may mislead women into believing that they will be able to obtain child support; and 2) requiring physicians to tell patients that services exist to view the image or hear the heartbeat of their unborn children is false because a fetus does not develop a discernible heartbeat until 6 to 8 weeks' gestation

and some women come in for abortions before that time.

### a) child assistance information

■■■ Pursuant to Wis. Stat. § 253.10(3)(c)2.b., a physician or a qualified person assisting the physician must inform the patient that the father of the unborn child is liable for financial support of the child. When women are told that fathers are liable for assistance, some women may be misled into believing that they will be able to obtain child support. But there is nothing in the statute that prevents a physician from informing women that although the law makes the father liable for assistance, obtaining that assistance may be difficult. Moreover, the Pennsylvania statute at issue in *Casey* had a virtually identical provision that the Court did not address, apparently because it did not find the required information false or misleading. *See* 18 Pa. Cons.Stat. Ann. § 3205(a)(2)(iii) (1990) (woman must be informed that "the father of the unborn child is liable to assist in the support of her child, even in instances where he has offered to pay for the abortion . . . ."). I conclude that when the Wisconsin provision is interpreted to permit the physician to explain the difficulties of obtaining child support, it is no more misleading than the Pennsylvania provision. Thus, I cannot say that it is unconstitutional.

### b) auscultation of fetal heart tone services information

■■■ Under Wis. Stat. § 253.10(3)(c)1.g., a doctor must inform a woman seeking to obtain an abortion that "fetal ultrasound imaging and auscultation of fetal heart tone services are available . . . to view the image or hear the heartbeat of her unborn child." It is both false and misleading to give patients this information. Using either of the two methods to auscultate fetal heartbeats (a hand-held ultrasound machine or a stethoscope), the earliest a fetal heartbeat can be heard is about ten to twelve weeks' gestation. Thus, women who seek abortions before this time will not be able to avail themselves of auscultation. Defendants argue that it is unreasonable to interpret the statute to require physicians to tell patients that services

are available if those patients have not reached 10 to 12 weeks' gestation. According to defendants, if it is' too early in a woman's pregnancy for auscultation, a physician can explain to the woman that the services are not available yet. Defendants fail to note that the statute demands that physicians tell patients that auscultation is available to enable them to hear a fetal heartbeat. Unlike the provision requiring a physician to inform her patient that the father is liable for assistance, under which a doctor can provide true information and flesh out the details of the difficulties of obtaining child support, the auscultation requirement leaves no room for explanation. Physicians are left in the position of telling their patients that they must provide the information, but because this it is not true, it is liable to create confusion and cause a woman to doubt her physician. Moreover, it serves no medical purpose. I conclude that Wis. Stat. § 253.10(3)(c)1.g. hinders rather than informs a woman's choice and thus is an unconstitutional undue burden on a woman's right to choose.

This conclusion does not render AB 441 unconstitutional in whole. Under Wisconsin law, it is permissible to sever unconstitutional provisions while maintaining the rest of the law. *See Leavitt v. Jane L.,* —— U.S. ——, ——, 116 S.Ct. 2068, 2069, 135 L.Ed.2d 443 (1996) (severability is matter of state law); Wis. Stat. § 990.001(11) ("The provisions of the statutes are severable."). A provision may not be severed if it would produce a result at odds with the "manifest intent of the legislature." *Burlington Northern, Inc. v. City of Superior,* 131 Wis.2d 564, 580, 388 N.W.2d 916, 923 (1986). Thus, a provision should not be severed if it appears that the legislature intended the statute to be effective only as an entirety and would not have enacted the valid part by itself. *Id.* at 580–81, 388 N.W.2d at 924.

AB 441 provides no indication that the legislature would have wanted the entire law to fall if the auscultation provision fell. Without the auscultation provision, AB 441 functions in the same fashion; it merely loses one element of the informational array. Although Wis. Stat. § 253.10(3)(c)1.g. will be severed from the rest of AB 441, the bulk of the law remains in place and is subject to further constitutional scrutiny.

### 3) medical emergency provision

It is well-established that a state may not interfere with a woman's choice to undergo an abortion if continuing her pregnancy would constitute a threat to her health. *See Casey,* 505 U.S. at 880, 112 S.Ct. at 2822 ("essential holding of *Roe* forbids a State to interfere with a woman's choice to undergo an abortion procedure if continuing her pregnancy would constitute a threat to her health") (citing *Roe,* 410 U.S. at 164, 93 S.Ct. at 732 and *Harris v. McRae,* 448 U.S. 297, 316, 100 S.Ct. 2671, 2687–88, 65 L.Ed.2d 784 (1980)). Relying on this principle, the plaintiffs in *Casey* challenged the constitutionality of the Pennsylvania statute's medical emergency provision, which the plaintiffs contended was too narrow and prevented some women from obtaining immediate abortions despite significant health risks. The Court rejected the plaintiffs' challenge on the ground that the Court of Appeals for the Third Circuit had interpreted the provision to be broad enough to assure that any woman with a serious risk to her health would be able to obtain an immediate abortion. *Id.*

In this case, plaintiffs raise a comparable objection to the medical emergency provision in AB 441. Wisconsin's medical emergency provision is similar to Pennsylvania's but not identical. The Pennsylvania statute defines a medical emergency as:

> [t]hat condition which, on the basis of the physician's good faith clinical judgment, so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function.

18 Pa. Const. Stat. § 3203 (1990). The Wisconsin provision, patterned closely on the Pennsylvania model, reads:

> a condition, in a physician's reasonable medical judgment, that so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for

which a 24–hour delay in performance or inducement of an abortion will create serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions.

Wis. Stat. § 253.10(2)(d). Plaintiffs challenge this provision in two respects. First, they make the same objection the plaintiffs made in *Casey*: the definition is too narrow and will prevent some women with serious health risks from being able to obtain immediate abortions necessary to protect their health. Plaintiffs say that the Court's rejection of this argument in *Casey* is not binding because this court must interpret the language of AB 441's medical emergency provision pursuant to Wisconsin canons of statutory interpretation. In plaintiffs' view, the Third Circuit's reading of the similar Pennsylvania provision does not lock a court in Wisconsin into the same interpretation. Second, plaintiffs focus on the biggest difference between the Wisconsin and Pennsylvania provisions: Wisconsin's adoption of a "reasonable medical judgment" standard rather than a "good faith" one like Pennsylvania's. According to plaintiffs, the "reasonable medical judgment" standard will chill the conduct of doctors facing emergencies because they will not be able to rely solely on their subjective good faith medical judgment but will be subject to an objective reasonableness inquiry after the fact.

In a related argument, plaintiffs contend that AB 441 is deficient because it does not contain an exception like its Pennsylvania counterpart for situations in which furnishing the informed consent information would result in "a severely adverse effect on the physical or mental health of the patient." *See* 18 Pa. Cons.Stat. Ann. § 3205(c) (1990). Because this argument pertains to situations that threaten a woman's health, I will consider it along with plaintiffs' other medical emergency arguments.

a) narrowness of definition

■ Plaintiffs' first argument was entertained at substantial length by the District Court for the Southern District of Indiana in *Newman*, 904 F.Supp. 1434. The court examined a medical emergency provision prem-

ised on the one upheld in *Casey, see id.* at 1466 (Indiana statute contains "almost identical language") and very similar to the one contained in AB 441. (The medical emergency provision was part of a broader Indiana informed consent law that contained an 18–hour waiting period.) For the purpose of deciding a motion for a preliminary injunction, the court undertook an extensive interpretive inquiry based on Indiana state-law principles of statutory construction and concluded that plaintiffs had a reasonable likelihood of prevailing on the merits of their claim that the medical emergency provision was unconstitutionally narrow because there were instances in which it did not allow emergency abortions even though a woman's medical condition posed a threat to her health. *Id.* at 1467–68. However, the court determined that it was best to certify the interpretive questions surrounding the medical emergency provision to the Indiana Supreme Court for final resolution.

Responding to the certified questions, the Indiana Supreme Court held that the Indiana medical emergency provision allowed physicians to bypass the waiting period requirement when compliance would pose a significant threat in any way to the life or health of a woman or when it threatened to cause a woman severe psychological harm. *A Woman's Choice–East Side Women's Clinic v. Newman*, 671 N.E.2d 104, 106 (Ind.1996). However, the court explained that the statute did not except compliance when such compliance would cause severe but temporary physical health problems. *Id.*

Wisconsin does not allow federal district courts to certify questions of law to the state supreme court Wis. Stat. § 821.01 (listing courts that may certify questions to supreme court). District courts must try to predict from existing state law how the state courts would interpret Wisconsin's medical emergency provision, keeping in mind that federal courts should be wary of expanding the boundaries of established state jurisprudence. *See King v. Damiron Corp.*, 113 F.3d 93, 97 (7th Cir.1997). I believe that if the Wisconsin courts were to interpret the provision at issue, they would give considerable weight to the idea that the Wisconsin legisla-

ture was intending to enact a provision with a meaning similar to the one interpreted by the Court in *Casey*. *See State v. J.C. Penney Co.*, 48 Wis.2d 125, 138, 138 n. 9, 179 N.W.2d 641, 647, 647 n. 9 (1970) (principle that legislature adopts judicial construction of another state's statute when it adopts that statute is well-recognized); *State v. Vonesh*, 135 Wis.2d 477, 488–89, 401 N.W.2d 170, 176 (Ct.App. 1986) (because state's rape shield law patterned after Michigan's, decisions of Michigan courts entitled to weight). The Wisconsin legislature adopted essentially the same language as that found in the medical emergency provision of the Pennsylvania statute. This suggests that the Wisconsin legislature intended the term "serious risk of substantial and irreversible impairment of ... the woman's major bodily functions," Wis. Stat. § 253.10(2)(d) (1996), to have the same meaning it has in Pennsylvania's law. The statute contains no indication to the contrary. Accordingly, I read the language in AB 441 as broad enough to allow physicians to perform immediate emergency abortions *when there is a significant threat to a woman's health.* I am convinced that this is the reading the Wisconsin courts would give the provision if they were called on to interpret it.

b) *reasonable medical judgment*

██ The statute's reference to a "reasonable medical judgment" standard raises difficult questions concerning the validity of AB 441. The Wisconsin legislature did not copy Pennsylvania's language for evaluating a physician's decision to bypass the informed consent procedures in emergency situations. Instead of the subjective "good faith" standard found in the Pennsylvania law and in other state statutes modeled after Pennsylvania's, *see* N.D. Cent. Code § 14–02.1–02(7) ("best clinical judgment"); Ind. Code § 16–18–2–223.5 ("good faith clinical judgment"), Wisconsin enacted an objective reasonableness test. The question is whether there is any significance to the difference.

Certainly, physicians will feel more comfortable determining that an emergency exists under the terms of a statute if they know that their decision need only comport with their own good faith medical judgment *See*

*Planned Parenthood of Southeastern Pennsylvania v. Casey*, 947 F.2d 682, 702 (3rd Cir.1991) (good faith standard makes it far less likely that doctor need fear liability for her actions); *Newman*, 671 N.E.2d at 109 (same). Plaintiffs argue that the "reasonable medical judgment" standard is so much stricter that it will tie the hands of physicians attempting to make emergency decisions, chill them from performing emergency abortions when they should and thereby pose an unconstitutional threat to women's health. Plaintiffs' challenge is essentially that the reasonable medical judgment standard renders the medical emergency provision unconstitutionally vague because physicians will not be able to tell which situations meet the standard and which do not. The Supreme Court has dealt with several vagueness challenges to abortion statutes, upholding statutes in *United States v. Vuitch*, 402 U.S. 62, 69–71, 91 S.Ct. 1294, 1298–99, 28 L.Ed.2d 601 (1971) and *Doe v. Bolton*, 410 U.S. at 191–92, 93 S.Ct. at 747–48 and striking one down in *Colautti v. Franklin*, 439 U.S. 379, 390–97, 99 S.Ct. 675, 683–87, 58 L.Ed.2d 596 (1979). In *Colautti*, the Court found the statute unconstitutionally vague because it left doctors uncertain whether they would be judged on an objective or subjective basis in making a required determination that a fetus was "viable" or "may be viable" before performing an abortion. *See also Women's Medical Professional Corp. v. Voinovich*, 911 F.Supp. 1051, 1077 (S.D.Ohio 1995) (plaintiff demonstrated substantial likelihood of success on argument that statute was unconstitutionally vague because it did not clarify whether doctor would be judged by subjective or objective standard). Here, the statute makes clear that the standard is an objective one; there is no confusion on that score.

██ Under traditional theories of tort law, doctors have a duty to exercise due care, that is, to act reasonably, in treating all their patients. *Nowatske v. Osterloh*, 198 Wis.2d 419, 432–33, 543 N.W.2d 265, 270 (1996). This duty would extend to a doctor's decision to perform an emergency abortion to protect a patient's health. Although doctors may disagree about what constitutes a "serious risk of substantial and irreversible impairment of one or more of the woman's major

bodily functions," a doctor who chooses a course of action with which other doctors disagree is not necessarily acting unreasonably. If there are two reasonable options, in this case either performing an emergency abortion immediately or waiting 24 hours, the doctor who chooses either of those reasonable options will have acted within her reasonable medical judgment.

Testimony revealed that reasonable medical opinion can differ concerning whether emergency abortions are necessary to protect the health of the mother when problems arise such as transient ischemic attacks, heavy vaginal bleeding, premature rupture of amniotic membranes, spontaneous abortion, hyperemesis, cardiac problems and preeclampsia. Dr. Karlin testified that she once performed an abortion that she believed necessary to protect the patient from a large-scale stroke when that patient's previous doctor did not believe that an immediate abortion was necessary. Disagreement between doctors is not unusual. It does not make Dr. Karlin's decision to perform an emergency abortion unreasonable. Although other doctors might not have found the abortion necessary in this instance, it is not clear that they would find Dr. Karlin's decision unreasonable. Holding doctors to a standard of reasonable medical care in their treatment of patients is not unduly burdensome.

The reality is that any potential chill caused by the uncertainty of the medical emergency provision is unlikely, simply because there are few situations in which a doctor would think that she was making a good faith judgment to perform an emergency abortion but not a reasonable one. The plaintiff physicians perform very few emergency abortions. Dr. Karlin has performed three emergency abortions for the sake of a woman's health. Dr. Prohaska has not undertaken any since he began working for plaintiff Planned Parenthood. Dr. Christensen performs several a year. The infrequency of emergency abortions does not mute the importance of having a constitutionally viable medical emergency provision for those situations in which a woman's health is truly in jeopardy, but it does diminish the extent of the concern.

c) lack of exception for situations where distributing information will be damaging to woman's health

 Plaintiffs raise another argument pertaining to women's health, contending that AB 441 is unconstitutional because it does not contain an exception like the Pennsylvania statute for situations in which furnishing the informed consent information would result in "a severely adverse effect on the physical or mental health of the patient." See 18 Pa. Cons.Stat. Ann. § 3205(c) (1990). According to plaintiffs, the lack of such an exception means that physicians are bound to provide all the information required by the statute, even in situations in which the information would cause a patient psychological harm. Such a requirement contravenes the general principle that states should not be interfering with a woman's right to choose in a manner that jeopardizes her health, see Casey, 505 U.S. at 880, 112 S.Ct. at 2822, and the Court's holding in Thornburgh, 476 U.S. at 762, 106 S.Ct. at 2179, that state abortion regulations cannot "straitjacket" a physician into an inflexible rote delivery that does not comport with the physician's medical judgment or the patient's needs. Casey, 505 U.S. at 883–84, 112 S.Ct. at 2823–24. Because the Pennsylvania statute provided an exception for such situations, the Court did not have to consider an objection similar to the one raised by plaintiffs, but the Court did note specifically that § 3205(c) allowed the physician to exercise his or her medical judgment, thereby signifying that the Pennsylvania statute remained consistent with the Court's holding in Thornburgh, 476 U.S. at 762, 106 S.Ct. at 2179. Although in Casey the Court departed from Thornburgh in some respects, Casey, 505 U.S. at 883, 112 S.Ct. at 2823–24, it is questionable whether the Court intended to bar physicians from omitting information that harms rather than helps their patients.

The Court found no constitutional problems with the Pennsylvania statute's requirement that physicians must provide informed consent information even if they believed it irrelevant to an individual patient, but the Court did not address the constitutional difficulties of a statute like AB 441 that takes

away a doctor's discretion to omit the informed consent information when in the exercise of his medical judgment he believes his patients face threats to their psychological health from being confronted with the information. In *Thornburgh*, the Court had noted that fetal description requirements might confuse a woman and heighten her anxiety about the abortion procedure, contrary to accepted medical practice. *Thornburgh*, 476 U.S. at 762, 106 S.Ct. at 2179. In *Casey*, the Court brushed aside concerns about heightened anxiety, apparently operating on the presumption that even if hearing the informed consent information would cause women to suffer discomfort it would not cause them psychological harm.

The line between discomfort and psychological harm is not one that courts are well-equipped to define. However, a court's lack of medical training does not prevent it from recognizing that requiring doctors to provide certain informed consent information in situations in which women would suffer psychological harm would contradict the entire purpose of informed consent laws like AB 441, namely to provide women with the information needed to make informed decisions affecting their health and the health of their fetuses.

After *Casey*, physicians are left with little room to determine that providing specific information would lead to psychological harm. However narrow that area of discretion is, I find that it is applicable here in two situations that even defendant's expert, Dr. John Gianopoulos, admits would cause a woman psychological harm. When a woman is pregnant as a result of sexual assault or incest, requiring a physician to provide information about a father's responsibility for child assistance would cause psychological damage. *See* Wis. Stat. § 253.10(3)(c)2.b. (The Pennsylvania statute specifically excluded the provision of such information in cases of rape. *See* 18 Pa. Cons.Stat. Ann. § 3205(a)(2)(iii) (1990) (in case of rape, information about father's liability for assistance may be omitted)). Similarly, Dr. Gianopoulos testified that it would be cruel to require the distribution of information about a father's liability and the state's assistance to a woman whose fetus has been diagnosed with a lethal anomaly. *See* Wis. Stat. 253.10(3)(c)2.a–g. In addition to being cruel, the distribution of such information would serve no medical purpose. Because the provision of such information in these two situations would cause psychological harm and serve no valid medical purpose, it would be unconstitutional to require physicians to provide it. Therefore, I conclude that AB 441 is constitutional only if it is read as not requiring doctors either to give the information in § 253.10(3)(c)2.b. when a woman is pregnant as a result of sexual assault or incest or to disseminate the information required by § 253.10(3)(c)2. to women whose fetuses have been diagnosed with a lethal anomaly. Doctors are free to determine whether their patients are the victims of sexual assault or incest or are carrying fetuses that have been diagnosed with a lethal fetal anomaly.

■ With respect to women who wish to utilize AB 441's procedures for exemption from the 24–hour waiting period because they are pregnant as a result of sexual assault or incest (reduction to two-hour waiting period rather than full exemption), they must comply with the reporting requirements of those provisions. *See* Wis. Stat. § 253.10(3m). The fact that women will be hesitant to report such information to local police departments does not render these exemption provisions unconstitutional.

■ Plaintiffs contend that requiring physicians to orally describe fetal anatomy to a woman who explains that she does not want to hear the information interferes with a physician's ability to utilize her best medical judgment and is therefore unconstitutional. The statute at issue in *Casey* did not require an oral discussion of fetal anatomy. *See* § 253.10(3)(c)1.d. It is not difficult to understand plaintiffs' concern in providing this information. Even lay people can predict the reaction that some women will have when a physician tells them of the physical characteristics of a fetus they intend to abort. The physician-patient relationship will suffer if a physician keeps talking against the wishes of the patient. However, unlike the assistance provisions discussed above, the state does advance what *Casey* has determined is a

legitimate state interest in requiring doctors to provide fetal anatomy information to every patient, whether they want that information or not. For many women, the informed consent information contained in AB 441 will be neither pleasant nor desired, but plaintiffs have not shown or even argued that the fetal characteristic information is psychologically harmful. *See Newman,* 904 F.Supp. at 1466 (state cannot regulate abortion in way that causes harm to women's health). Plaintiffs may believe that the distribution of the information is cruel, but it achieves the state's goal of promoting an informed choice and thus, under *Casey* cannot be said to lack a legitimate purpose.

## C. *First Amendment Arguments*

Plaintiffs raise two First Amendment challenges to AB 441. First, the act requires the dissemination of religious information about abortion to women seeking abortions in violation of the establishment clause of the First Amendment. Second, AB 441 violates the First Amendment's free speech clause by censoring the information that physicians may provide to their patients and by requiring plaintiffs to purchase and distribute materials to which they have an ideological opposition.

### 1. *Establishment clause*

The First Amendment of the United States Constitution, which applies to the states by incorporation through the Fourteenth Amendment, provides that "Congress shall make no law respecting an establishment of religion." Plaintiffs contend that AB 441 violates this provision by requiring abortion providers to disseminate religious information. The basis of plaintiffs' argument can be found in the testimony of defendants' expert, Dr. Edmund Pellegrino, who did not appear at the evidentiary hearing but whose deposition testimony is part of the record. Pellegrino testified that under Wis. Stat. § 253.10(3)(c)1.j. (physician must provide "any other information that a reasonable patient would consider material and relevant to a decision of whether or not to carry a child to birth or to undergo an abortion"), a physician must offer those patients with religious

beliefs information about their religion's point of view on abortion. This is a wholly implausible interpretation of § 253.10(3)(c)1.j. Nothing in the statute suggests that the state intended to require physicians to distribute religious information to anyone or that it believed physicians were capable of providing relevant information on the myriad religious concerns of a diverse patient population. Accordingly, I cannot say that AB 441 concerns the establishment of religion.

### 2. *Free speech clause*

#### a. Viewpoint discrimination

Plaintiffs contend that AB 441 will prevent physicians from providing certain information and expressing certain viewpoints about abortion to their patients. As with their establishment clause argument, plaintiffs base their viewpoint claim on testimony about the meaning of the statute proffered by defendants' expert witnesses, such as Dr. Pellegrino and Dr. Anne Speckhard. But these witnesses are not experts in statutory interpretation. Statutory interpretation is a matter for the court to resolve on the basis of applicable canons of construction. AB 441 contains no indication that doctors are forbidden from expressing their own views about the subjects the state is requiring them to discuss with their patients. AB 441 requires physicians to provide their patients information on a number of topics, but it does not tell them what they may not discuss with their patients.

#### b. Forced contribution to political position

In their final First Amendment argument, plaintiffs contend that AB 441 abridges their rights to freedom of speech by requiring them to pay for and distribute information that they oppose on ideological grounds. The Supreme Court summarily rejected a somewhat similar challenge in *Casey,* holding that the state of Pennsylvania could require physicians to distribute information about the risks of abortion and childbirth as part of the state's regulation of the practice of medicine, *Casey,* 505 U.S. at 884, 112 S.Ct. at 2824. Wisconsin takes physicians' involvement a step further than Penn-

sylvania. AB 441 provides that the state may charge abortion providers a fee for both the state-printed materials that abortion providers are required to distribute and the county department-compiled materials that physicians must give out upon request. The fee may not exceed the actual cost of preparation and distribution of the materials. Wis. Stat. § 253.10(3)(d); Wis. Stat. § 46.245(1).

Neither Pennsylvania nor any of the states (save Idaho) that adopted informed consent provisions in the wake of *Casey* have imposed the burden of paying for informed consent materials on physicians. *See* 18 Pa. Cons.Stat. Ann. § 3208(c) (materials to be made available at no cost); La.Rev.Stat. § 40:1299.35.6(C)(3) (same); Miss.Code Ann. § 41–41–35(3) (same); N.D. Cent.Code § 14–02.1–02.1(2) (same); S.D. Codified Laws Ann. § 34–23A–10.3 (same); Utah Code Ann. § 76–7–305.5(1); *but see* Idaho Code § 18–609 (state materials "to be made available at the expense of the physician, hospital or other facility providing the abortion"). In addition, AB 441 requires abortion providers to "physically give" the state-printed materials to their patients, *see* Wis. Stat. § 253.10(3)(c)2.d, whereas the Pennsylvania statute provided only that physicians had to inform patients of the availability of such materials. *See* 18 Pa. Cons.Stat. Ann. § 3205(a)(2)(i).

Defendants contend that plaintiffs' concern about paying for the materials is not an issue because the state is prepared to cover the costs of these materials this year. This view is too short-sighted. Defendants admit that they have no idea whether the state will cover the costs of the materials in the future. Thus, even if the state does happen to pay for these materials this year, the issue does not disappear. Plaintiffs may very well be charged a fee for these materials in the future.

In *Casey*, the Court noted that the Pennsylvania statute implicated the First Amendment rights of physicians not to speak, *Casey*, 505 U.S. at 884, 112 S.Ct. at 2824 (citing *Wooley v. Maynard*, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977)), but found that the statute was merely regulating the practice of medicine in a reason-able manner, a perfectly constitutional practice. The Court did not say whether the informed consent provisions constituted political or ideological viewpoints. Instead, it treated the informed consent provisions merely as involving discussion of the risks of abortion and childbirth, even though the statute was expressing the state's interest in promoting childbirth over abortion, an interest the Court blessed with its constitutional imprimatur. *Id.* at 884, 112 S.Ct. at 2824. The Court did not acknowledge that abortion providers might have considerable difficulty accepting the premise that childbirth is always preferable to abortion.

■ Plaintiffs have a right not to be compelled to financially support political and ideological projects with which they disagree. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977). Whether the state-printed and county-compiled materials constitute political or ideological viewpoints that plaintiffs would be supporting by purchasing them is an interesting question. AB 441 requires physicians to discuss the medical risks of the abortion procedure with their patients, but the statute is far more than a simple vehicle for information distribution. AB 441 forces physicians to associate themselves with the state's anti-abortion message, a message that is implicit in the information provided even if it is never stated explicitly. The printed materials that Wisconsin physicians may be required to pay for and physically distribute will include photographs, pictures or drawings designed "to inform women of the probable anatomical and physiological characteristics of the unborn child." Wis. Stat. § 253.10(3)(d)2. Such pictures carry far more than an "informational" purpose. They are likely to have a distinct impact on patients, an impact that plaintiff physicians believe improper. Requiring physicians to make contributions to support the dissemination of such politically-charged information violates the principles set forth in *Abood*, 431 U.S. 209, 97 S.Ct. 1782, and in *Keller v. State Bar of California*, 496 U.S. 1, 13, 110 S.Ct. 2228, 2235–36, 110 L.Ed.2d 1 (1990) (state bar may not use compelled fees to fund political activities). The state of Wisconsin may not compel physicians to pay

for materials that the state is using to convey its message. Accordingly, I find that the portion of Wis. Stat. § 253.10(3)(d) that permits the state to charge a fee for the informational materials is unconstitutional and must be severed from the rest of the legislation. The state may not charge physicians for the state-printed or county-compiled materials, although it may require them to give them out to their patients.

As with the fetal auscultation provision, severing the payment provision does not render the entire statute unconstitutional. The legislature would have wanted the statute to remain in effect without the payment provision, even though it will impose a minor financial responsibility upon the state. Moreover, the fact that the payment provision is unconstitutional does not indicate that the other informational provisions of the statute are impermissible restrictions on physicians' First Amendment rights. The Supreme Court resolved that First Amendment question against physicians in *Casey* and it cannot be reopened here.

### D. *Vagueness*

Plaintiffs contend that AB 441 subjects physicians to severe penalties for disobeying statutory provisions that are unclear and that as a result AB 441 must be found void for vagueness. The void for vagueness doctrine rests on the premise that due process requires laws to be clear enough to give fair notice to the public as to what activities will subject them to sanctions. *Colautti*, 439 U.S. at 390, 99 S.Ct. at 683. Especially when constitutional rights are at stake, people are entitled to be made aware of precisely what conduct a statute makes illegal so that they are not chilled in the exercise of their constitutional rights and so that discriminatory application of the law can be avoided. *Id.* at 391, 99 S.Ct. at 683.

Plaintiffs maintain that a number of provisions in AB 441 are unconstitutionally vague, including: "qualified physician" as defined in § 253.10(2)(g); "psychological trauma" as included among the risks associated with a particular abortion procedure that doctors must disclose under § 253.10(3)(c)1.f.; "any other information" as used in § 253.10(3)(c)1.j.; the conflicting medical emergency provisions in § 48.375(4)(a)1 and § 253.10(2)(d); and the definition of "abortion" found in § 253.10(2)(a) as it pertains to emergency contraception.

### 1. *Qualified physician*

I have explained already that the term "qualified physician" is too unclear to allow physicians to rely on others to provide the initial informed consent consultation. However, I concluded that although the term "qualified physician" is ambiguous and means that in practice AB 441 will require two trips to an abortion provider, AB 441 is not unconstitutional. There is little need to discuss the provision at more length here. The statute does not require physicians to employ other "qualified physicians" to disseminate the informed consent information. Doctors who undertake the informed consent procedures themselves need not fear that the vagueness of the "qualified physician" provision will leave them subject to liability.

### 2. *Psychological trauma*

Plaintiffs proffered evidence with respect to the "psychological trauma" provision of § 253.10(3)(c)1.f., contending that there is no established risk of psychological trauma associated with abortion and that as a result, physicians will not know what to tell their patients about the risk of psychological trauma in order to comply with the statute. Nada Stotland, M.D., chief of psychiatry at Illinois Masonic Medical Center in Chicago, Illinois, testified in support of plaintiffs' position. According to Stotland, there are no medically accepted risks of psychological trauma, or injury, associated with abortion because there is no way to separate the circumstances surrounding a stressful pregnancy from the abortion procedure itself. A pregnancy might be stressful for any of a number of reasons including that the pregnancy is unwanted, desertion by the father, poverty, youth, immaturity, rape or incest. Stotland believes that a woman is at a higher risk for psychological trauma if she carries a stressful pregnancy to term.

Defendant's expert, Anne Speckhard, Ph. D., disagreed, saying that in some women

abortion leads to post-traumatic stress disorder. According to Speckhard, the "death event" involved in abortion is a potential "traumatic stressor" because it severs the psychological and physical "maternal-infant attachment bond" developed during pregnancy. Following an abortion, a woman may suffer "persistent reexperience," of the death event, including "intrusive thoughts" and nightmares that lead to depression, irritability, and difficulty sleeping or concentrating. If the persistent reexperience lasts for more than a month, Speckhard would consider the woman to have post-traumatic stress disorder. Speckhard testified that at least 20% of women who have abortions suffer from post-traumatic stress disorder and that approximately 40 to 45% of women having abortions evidence some post-traumatic sequelae, such as guilt, grief and shame. Speckhard believes that the psychological effects of abortion are different from the psychological effects of a stressful pregnancy because of the "death event" involved in abortion that is not necessarily part of a stressful pregnancy. The intrusive thoughts or nightmares of women suffering psychological problems after abortion are defined around the "death event" rather than emotions about the problem pregnancy itself.

Speckhard's testimony does not come dose to satisfying the *Daubert* test. *See* 509 U.S. 579, 113 S.Ct. 2786. She has no credentials in psychology; her Ph.D. was earned in Family Social Science. None of her work has been peer-reviewed; none of it was shown to enjoy acceptance in the scientific community. Speckhard's opinion that 2096 of women who have abortions suffer from post-traumatic stress disorder is ludicrous. If she were correct, approximately 4,000,000 women (the 20% of the estimated 20,000,000 women who have had legal abortions since 1973) would be suffering from the disorder. This would be a psychiatric epidemic of epic proportions that could hardly escape the notice of the nation's physicians.

Accordingly, I have disregarded all of the Speckhard testimony. Nonetheless, even plaintiffs' experts admit that some women do suffer some psychological consequences after undergoing an abortion, even if those conse-

quences are short of an actual "injury." Dr. Karlin herself has a notation on her standard medical chart to check whether a patient appears to be suffering post-traumatic stress disorder. No doubt much psychological injury, if it occurs, is bound up with the stress of the pregnancy itself, but I cannot say on the basis of the present record that there could never be a psychological injury from the fact of abortion.

Doctors are required to inform patients about the risk of psychological trauma "associated with the particular abortion procedure," Wis. Stat. § 253.10(3)(c)1.f, but some doctors reasonably believe that no such risk exists. The disagreement does not render the provision void for vagueness. Doctors may disagree as well about the extent of the other risks AB 441 requires them to discuss with their patients, but the statute does not specify exactly what information physicians must provide about the risks. If doctors discuss the risks on the basis of their medical training and experience, they have no legitimate fear of prosecution. This means that if a physician believes that no psychological trauma is associated with the abortion procedure to be used, that is what the statute requires him or her to tell the patient. The legislature did not specify the exact details of the risks to be discussed. It left that determination to the individual doctors. Having done so, it has created no risk of prosecution for doctors who explain the medical risks of abortion in conformance with their own best medical judgment.

3. *"Any other information"*

Pursuant to § 253.10(3)(c)1.j, physicians must inform their patients seeking abortions of "[a]ny other information that a reasonable patient would consider material and relevant to a decision of whether or not to carry a child to birth or to undergo an abortion." I have noted already that notwithstanding Dr. Pellegrino's broad interpretation of this section, the provision does not violate the establishment clause of the First Amendment because there is no indication the legislature intended to require the dissemination of religiously inspired material. However, Dr. Pellegrino's testimony does

point out another problem with § 253.10(3)(c)1.j: it is unconstitutionally vague. There is no way physicians will be able to know whether they have complied with this section. The provision requires physicians to divine what "reasonable patients" would want to know in this situation, a task that entails substantial guesswork at the pain of heavy penalties if the guess is wrong. Because this section does not offer doctors sufficient notice of what is required of them, I will strike it as unconstitutional and sever it from the statute.

### 4. Contradiction between medical emergency provisions

Wis. Stat. § 253.10(2)(d) and Wis. Stat. § 48.375(4)(b)(1) (a law pertaining to minors seeking abortions) contain contradictory medical emergency provisions, which plaintiffs contend renders AB 441 void for vagueness. The medical emergency provision in § 253.10(2)(d) requires a doctor to determine whether an emergency exists in his "reasonable medical judgment," while § 48.375(4)(b)(1) permits emergency abortions without parental involvement if the physician decides "to the best of his or her medical judgment, that a medical emergency exists that complicates the pregnancy so as to require an immediate abortion." Wis. Stat. § 48.375(4)(b)(1). Plaintiffs are correct that the two provisions employ different standards ("reasonable medical judgment" versus "best medical judgment"), but plaintiffs overstate the potential conflict. If a physician is considering an emergency abortion for a minor, she will be immune from liability if she makes a decision based on reasonable medical judgment. Requiring doctors to comply with the stricter standard is constitutional and cures any potential vagueness concerns.

### 5. Emergency contraception

Finally, plaintiffs suggest that AB 441's definition of "abortion" is vague and will chill physicians from providing emergency contraception, commonly referred to as the "morning-after pill." Pursuant to Wis. Stat. § 253.10(2)(a), abortion means "the use of an instrument, medicine, drug or other substance or device with intent to terminate the pregnancy of a woman *known to be pregnant or for whom there is reason to believe that she may be pregnant ...*" (emphasis added). The alleged vagueness arises from the legislature's failure to define pregnancy. Under the standard medical definition, pregnancy does not begin until the zygote's implantation in the uterus, approximately six days after conception. However, some doctors, including defendants' witness, Dr. Nina Kiekhaefer, believe that pregnancy begins with conception. Plaintiffs assert that because of the legislature's failure to define pregnancy, they do not know whether AB 441 applies to emergency contraception.

There are several different types of medication that can be used as emergency contraception: all work by preventing implantation of a zygote into the wall of the uterus. If pregnancy does not begin until implantation, emergency contraception does not constitute an abortion under AB 441 and the 24–hour waiting period and the informed consent procedures do not apply. If pregnancy begins at conception, as in Dr. Kiekhaefer's view, AB 441 would apply to emergency contraception, leading to delays that would seriously jeopardize the medication's effectiveness.

The only reasonable way to read AB 441 is as adopting the standard medical definition of pregnancy rather than the definition espoused by Dr. Kiekhaefer. If the legislature had chosen to depart from the standard definition, it would have made that choice explicit. There is no reason to assume that the legislature chose a minority definition when the statutory text gives no indication of such a decision. Moreover, adoption of Dr. Kiekhaefer's definition would create problems in determining whether a patient was pregnant because pregnancy cannot be detected until after implantation. In addition, that definition would make it impossible for a physician to fulfill the requirements of the first provision of the informed consent procedures, informing a woman whether she was pregnant. *See* Wis. Stat. § 253.10(3)(c)1.a. Accordingly, I conclude that AB 441 does not apply to the administration of emergency contraception.

## IV. CONCLUSION

The Supreme Court's decision in *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), was a serious and thoughtful effort to preserve the essential holding in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a pregnant woman is a person endowed with the personal liberty to make her own decision to continue her pregnancy or to terminate it before viability without undue interference from the state. Yet in upholding the provisions in Pennsylvania's law that allow the state to force women to listen to information intended to dissuade them from having an abortion and to require them to wait twenty-four hours after hearing such information before undergoing a procedure they have chosen already, the Supreme Court opened the door to extensive state intervention in matters of the highest privacy and most personal nature. So long as the state stops short of preventing women from obtaining abortions and clothes its laws with the veneer of "persuasion," *Casey* permits almost any effort by the state to influence what *Roe* protected and kept private. Thus, despite my own misgivings that in AB 441 the state of Wisconsin is intruding impermissibly into the formation of individual concepts "of existence, of meaning, of the universe and of the mystery of human life" that define the attributes of personhood lying at the heart of the liberty protected by the Fourteenth Amendment, *Casey*, 505 U.S. at 851, 112 S.Ct. at 2807, I am bound by the holding in *Casey* to find that most of the obstacles set up by AB 441 do not constitute undue burdens that would make the state law unconstitutional as a whole.

## ORDER

IT IS ORDERED that the motion of plaintiffs Elizabeth Karlin, M.D., Planned Parenthood of Wisconsin, Inc., Gary T. Prohaska, M.D., Dennis D. Christensen, M.D. and Summit Women's Health Organization for a permanent injunction is GRANTED in part and DENIED in part. FURTHER, IT IS ORDERED that

1) Wis. Stat. § 253.10(3)(c)1.g., requiring physicians to inform their patients that "fetal ultrasound imaging and auscultation of fetal heart tone services" are available is unconstitutional because it requires the provision of false and misleading information and is severed from the statute;

2) Wis. Stat. § 253.10(3)(c)1.j., requiring physicians to inform their patients of "[a]ny other information that a reasonable patient would consider material and relevant to a decision of whether or not to carry a child to birth or undergo an abortion" is unconstitutionally vague and is severed from the statute;

3) Wis. Stat. §§ 253.10(3)(d) and 46.245(1) are unconstitutional to the extent that they permit the state to charge physicians a fee for the state-printed and county-compiled materials. The fee-charging provisions are severed from the statute;

4) Wis. Stat. § 253.10(2)(d), the "medical emergency" definition, is constitutional only if construed to provide that physicians may perform emergency abortions when there is a significant threat to a woman's health;

5) Wis. Stat. § 253.10(3)(c)2.b. is constitutional only if construed as not requiring doctors to give the information specified in this provision to women who are pregnant as a result of sexual assault or incest;

6) Wis. Stat. § 253.10(3)(c)2. is constitutional only if construed as not requiring doctors to give the information specified in this provision to women whose fetuses have been diagnosed with a lethal anomaly; and

7) in all other respects, AB 441 is constitutional.

Plaintiffs' motion for summary judgment filed prior to the hearing on October 1996, is DENIED as moot. The temporary restraining order entered on May 6, 1996 is VACATED.

## OPINION AND ORDER ON MOTION

This civil action for injunctive relief is before the court on plaintiffs' motion to continue in effect a temporary restraining order pending resolution of certain issues. Plaintiffs are physicians who perform abortions and facilities at which abortions are performed. They brought suit in May 1996 to

enjoin the operation of AB 441, enacted by the Wisconsin legislature to regulate abortion providers. After briefing and a hearing, I granted plaintiffs' motion for a temporary restraining order. Later, the parties agreed to extend the temporary restraining order until resolution of the motion for permanent injunctive relief. After more briefing and a court trial, I found that AB 441 withstood plaintiffs' challenges in most respects and denied plaintiffs' motion for permanent injunctive relief. *See* Opinion and Order entered June 19, 1997 (dkt. 116) at 102. The day the decision was released, plaintiffs requested that the temporary restraining order remain in effect until plaintiffs had an opportunity to prepare to carry out their responsibilities under the new legislation and the court had determined the exact extent of plaintiffs' obligations to distribute to patients certain materials as mandated by AB 441. After a hearing, the parties agreed that the temporary restraining order should remain in effect until they could explore these issues and file briefs. Briefing is now complete.

I conclude that the opinion and order entered on June 19, 1997 needs to be clarified to reflect how the county list requirement within AB 441 must be interpreted to be constitutional. Also, I conclude that plaintiffs have shown their entitlement to a further extension of the temporary restraining order pending preparation of the state materials. However, I conclude that plaintiffs are not entitled to an extension of the temporary restraining order until such time as they have had an opportunity to check the accuracy of the state materials.

## BACKGROUND

AB 441 requires each county "in which a hospital, clinic or other facility in which abortions are performed is located" to prepare a list of "public and private agencies and services that are available to provide the woman [seeking an abortion] with birth control information, including natural family planning information." *See* Wis. Stat. §§ 46.245(2) and 253.10(3)(cm). The county is to "distribute the list to each of these hospitals, clinics or other facilities." Section 46.245(2). Physicians are required to give a copy of the list to the woman "[u]pon the request of the woman...." Section 253.10(3)(cm).

AB 441 requires the Wisconsin Department of Health and Social Services to print materials that provide the woman seeking an abortion a wide variety of information, ranging from drawings or pictures designed to inform the woman of the probable anatomical and physical features of the unborn child to information about governmentally funded programs serving pregnant women. *See* § 253.10(2)(d). Also included in these materials is a form that the woman must complete to certify that she has consented to the abortion procedure and has received all the state-prescribed information. *See* § 253.10(3)(c)5.

Under AB 441, physicians are required to obtain the state materials either from the state or from a county, § 253.10(3)(e), and must "physically give" them to the woman. Section 253.10(3)(c)2.d. A physician who violates this provision is subject to 1) a forfeiture of not less than $1,000 nor more than $10,000, § 253.10(5); 2) professional discipline, including the possibility of limitation, suspension or revocation of his or her license, Wis. Stat. § 448.02(3)(c); and 3) a civil suit brought by the woman who received the abortion, § 253.10(6).

As of June 19, 1997, when the opinion and order denying plaintiffs' motion for a permanent injunction was released, neither the state nor the counties had prepared any of the materials prescribed by AB 441. Plaintiffs were concerned that they would be held liable for failing to provide the state and county materials to their patients even though the materials had not been made available. The parties agreed that it was not evident how the unavailability of these materials affected AB 441 and further agreed that the temporary restraining order should be kept in place until plaintiffs' concerns were resolved.

## OPINION

In their briefing, plaintiffs have argued generally that they are entitled to have the temporary restraining order kept in effect until it is made clear that counties cannot keep them from performing abortions by refusing to prepare the county lists described

in § 253.10(3)(cm), until the DHSS has prepared and made available to them the state materials they are required to distribute and until they have had an opportunity to review the state materials for accuracy.

### A. *Applicable Standards*

Plaintiffs' request for an extension of the temporary restraining order must cross two barriers. Plaintiffs must establish first that they are entitled to injunctive relief under the standard applicable to all claims for temporary injunctive relief. To do this, plaintiffs must meet the threshold requirement that they have some likelihood of succeeding on the merits and that they will suffer irreparable harm if injunctive relief is not granted. If plaintiffs pass this threshold, they must show that the harm they would suffer is greater that the harm defendants would suffer and that public's interest will not be frustrated by injunctive relief. *See Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir.1992).

The other barrier is defendants' argument that this court is precluded from addressing plaintiffs' concerns about the content of and distribution plans for the county and state materials because the analysis would amount to "as applied" challenges that must wait until AB 441 has gone into effect. An "as applied" challenge requires a court to investigate how a statute works in a particular set of circumstances and how it has been "applied" to the party challenging the law. *See* Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 236 (1994); *see also Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247, 1261 n. 16 (7th Cir.1983) ("Given the minimal or nonexistent record with respect to the actual operation of the [statute] in the situation presented in this case, we do not think that the case can be properly considered an 'as applied' challenge."). If the court finds that the statute is unconstitutional "as applied," the statute may still be enforced under different circumstances. *See* Dorf, 46 Stan. L. Rev. at 236. The alternative type of statutory challenge is a "facial" challenge. In this type of challenge the court investigates how a statute might be applied. If a court finds the statute unconstitutional on its face, the stat-

ute cannot be applied unless a court narrows the statute so that it may be applied in a constitutional manner. *See id.*

Initially, plaintiffs brought a "facial" challenge to AB 441. *See* Opinion and Order entered June 19 at 46. Defendants complain that plaintiffs should not be permitted to "bootstrap" the current temporary restraining order into as an "as applied" challenge. They suggest that since plaintiffs "lost" their facial challenge, AB 441 must automatically go into effect and that any future challenge to it must come from persons who can show that AB 441 was unconstitutionally "applied" to them. Defendants cite the various opinions issued by the Supreme Court and the appellate and district courts of the Third Circuit in the *Planned Parenthood of Southeastern Pennsylvania v. Casey* litigation in support of their contention.

In *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court addressed a facial challenge to a Pennsylvania abortion law. In its analysis, the Court adopted a new "undue burden" standard for determining whether an abortion regulation interferes unconstitutionally with a woman's right to choose whether to continue or terminate her pregnancy. The standard announced in *Casey* governed the disposition of plaintiffs' challenge to the substantive elements of AB 441. What defendants rely on now, however, is a decision that the Court of Appeals for the Third Circuit issued after the Supreme Court reached its conclusions about the Pennsylvania law and had remanded the matter back to the Third Circuit. In *Casey v. Planned Parenthood of Southeastern Pennsylvania*, 14 F.3d 848 (3d Cir.1994), the court of appeals concluded that the district court in which the suit was originally brought did not have authority to reopen the record and evaluate the challenged abortion statute under the "new" standard that had been adopted by the Supreme Court. The court reasoned that such an attack on a statute could not follow right on the heals of earlier proceedings in which the same statute had survived a facial attack. *See id.* at 861–62; *see also Planned Parenthood of Southeastern Pennsylvania v. Casey,*

**1232**

510 U.S. 1309, 1311 n. 3, 1314, 114 S.Ct. 909, 910 n. 3, 911 (1994) (Souter, J., in chambers) (denying application to stay court of appeals' decision but noting that future litigants could bring an "as applied" challenge).

The state and counties' preparedness to distribute these materials can be evaluated without transforming these proceedings into an "as applied" challenge. Plaintiffs' arguments are directed at the language of the statute. There is no need for further fact-finding as there was in *Casey*. Indeed, it was the need to explore additional facts that motivated the challengers in *Casey* to move the district court to reopen the record on remand. *See Planned Parenthood of Southeastern Pennsylvania v. Casey*, 822 F.Supp. 227, 230, 235 (E.D.Pa.1993).

In considering whether plaintiffs have made the showings necessary to obtain an extension of the temporary restraining order, I will rely on the facts found in the opinions and orders issued previously.

### B. *The County Lists*

█ According to plaintiffs, there are two problems with the requirement that counties prepare lists. First, plaintiffs contend that the statutory provisions are vague. For example, they do not specify whether physicians have to distribute lists particular to the patient's home county or only lists particular to the county in which the provider is located. Second, plaintiffs argue that by making counties responsible for producing these required lists, the county has the power to ban abortions within its borders; by refusing to produce the list, a county can keep a provider from operating. Plaintiffs contend that such "zoning out" of abortions is a constitutional violation. *Cf. Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 868 (8th Cir.1977) (upholding injunction against city moratorium on construction of abortion clinics as unconstitutional effort to prohibit abortions).

Defendants make short shrift of plaintiffs' concerns. They cite the language of the statute as evidence that an abortion provider or qualified physician is required to give to a requesting patient only materials relating to the county in which the provider is located. Moreover, defendants contend that the re-sponsibility of preparing and distributing the lists falls solely on the counties. If the county has not produced the list and distributed it to the "hospitals, clinic or other facilities" where the procedure is performed, § 46.245(2), the physician has nothing to hand out and will not be in violation of the law. As to any argument that a county can prevent abortions from taking place within its borders, defendants repeat that a physician need not have the list before performing an abortion.

The structure and language of the provisions governing the county list requirement are far from clear. It is not surprising that plaintiffs have questions about the implementation of the provisions and concerns about how the provisions will be enforced. For example, § 253.10(3)(cm) provides that the physician who is to perform the abortion, a qualified person assisting the physician or another qualified physician "*shall*" provide the woman with "the list distributed under s. 46.245(2) by *a* county department." (Emphasis added). Such language suggests that the physician's obligation to provide the list is mandatory and not excused by any inability to obtain the lists. Section 46.245(2) introduces another question. The statute makes no provision for distributing county lists to any place other than a "hospital, clinic or other facility in which abortions are performed," although AB 441 contemplates that "another qualified physician" can be located anywhere in the state (or for that matter, outside it) and probably would not located in a "hospital, clinic or other facility in which abortions are performed." How would such a physician obtain the necessary county list?

These problems in the language of AB 441, coupled with the earlier findings that ambiguity in AB 441 could "chill" abortion providers and make it more difficult for women to obtain these services, *see* Opinion and Order entered June 19, at 1201–02, support a conclusion that the temporary restraining order should remain in effect. Plaintiffs have established that their concerns about the ambiguity of the county list requirement have merit and that they face irreparable harm should AB 441 go into effect. *See Abbott Laboratories*, 971 F.2d at 11–12.

However, defendants offer an interpretation of the county list requirement that cures the problems I have identified. Defendants explain that AB 441 should be interpreted in this manner:

> The qualified physician's county ... is not obligated to distribute the list to the qualified physician, unless he or she is an abortionist. Moreover, no physician—qualified physician or abortionist—is required to go to any effort to obtain the county's list: the statutes place the sole burden of list distribution upon the county. The physician's only duty is to distribute, upon request, whatever list has been distributed to him/her by the county.

Defendants' Brief on Issues Relating to Availability of Written Materials to be Produced by Counties Pursuant to Sec. 46.245(2), Stats. (dkt. 122) at 8. I agree that if the county list requirement of AB 441 is interpreted in this manner, then the problems are eliminated. Moreover, if AB 441 is narrowed according to defendants' interpretation, plaintiffs cannot contend plausibly that they will be "chilled" from providing abortion services because they will not face even the threat of prosecution until the county lists are prepared and distributed. And once the lists are prepared, their only duty will be to hand out, upon request, whatever list comes their way. Similarly, because a county's failure to produce the list will not interfere with the delivery of services, plaintiffs cannot contend plausibly that a county will be able to "zone out" abortion providers by refusing to prepare the list. Finally, because plaintiffs cannot show that they will be harmed should the county list requirement go into effect subject to this narrowed construction, there is no need for injunctive relief. *See Abbott Laboratories,* 971 F.2d at 11. Accordingly, I will cure the problems in the language of the county list requirement by narrowing AB 411 pursuant to defendants' interpretation.

### C. *The State Materials*

■ Plaintiffs' concerns about the state materials are also two-fold. They believe that they must have the state materials in hand if they are to obtain the lawful consent of their patients to the abortion procedure. To avoid the possibility that they will be prosecuted for illegally performing abortions under AB 441, plaintiffs ask that the temporary restraining order remain in effect until the materials have been made available to them. Second, they worry that the state materials will contain inaccurate information that they will be required to convey to their patients. To avoid a claim that they have violated their duty to advise patients truthfully and correctly, plaintiffs ask that the temporary restraining order remain in effect for a period beyond the time that the state materials become available, thereby enabling plaintiffs to review the content of the materials.

Again, defendants downplay plaintiffs' concerns. They argue that the law was designed to be implemented even in the absence of the state materials, as demonstrated by the provision that the Department of Health and Social Services would have 60 days after AB 441 went into effect in which to prepare the materials. *See* § 253.10(3)(d). In addition, they point out that AB 441 includes an affirmative defense to protect physicians from liability if the necessary materials are not available. *See* § 253.10(7). Finally, they claim that plaintiffs do not face any threat of prosecution should the materials not be available: if the state has not produced the materials, a prosecutor could not meet the burden of proving that the materials were available and would be ethically prohibited from initiating prosecution.

Plaintiffs' concerns are not as unsubstantiated as defendants assert. Unlike the language governing the county lists, the language describing the state materials is clear. The defendants do not even try to offer an alternative (and more constitutionally palatable) view of how AB 441 should be interpreted. And although AB 441 sets out an affirmative defense that would enable a physician who could not get the materials to escape *liability,* this affirmative defense would not protect the physician from the threat of *prosecution.* Thus, the only remaining bulwark between this troublesome aspect of AB 441 and a potential prosecutor is the possibility that an attempt to enforce

1234

the law would result in an ethics violation. I do not doubt the ethics of this state's prosecutors. Nonetheless, I have found that vocal constituencies and the strong philosophical convictions of some individual prosecutors could have a heavy influence on a prosecutor's charging decision and could motivate some prosecutors to enforce AB 441 if the temporary restraining order was lifted. *See* Opinion and Order entered June 19, at 40–41. Even if the chance of a conviction were remote, the risk of prosecution would chill abortion providers, thereby reducing the availability of abortion services and impairing women's reproductive rights. *See id.* at 41–42 (collecting authority to effect that physicians may assert the rights of their women patients).

On the issue of the state materials, taking into account the previous findings, I conclude that plaintiffs have established the prerequisites of entitlement to an injunction. They have shown that they will suffer irreparable harm if the injunction is not granted, that the harm they would suffer outweighs the harm that defendants would suffer if the restraining order remains in effect (indeed, defendants can end the restraining order by simply preparing the materials), that they have some likelihood of prevailing on the merits of their claim and that continued injunctive relief will not frustrate the public interest. *See Abbott Laboratories,* 971 F.2d at 11–12. Accordingly, I will retain the temporary restraining order in effect until defendants' counsel has advised the court and plaintiffs in writing that the state materials have been prepared and are ready for distribution. Once this is established, defendants may move for a lifting of the temporary restraining order.

■ As to plaintiffs' second request that the temporary restraining order remain in effect for some period beyond the time that the state materials become available, I find that plaintiffs have failed to show that they are entitled to injunctive relief. Although the contents of these materials are dictated by statute for the most part, *see* § 253.10(3)(d)2, and the required contents are generally constitutional, *see* Opinion and Order entered June 19, at 102–03, plaintiffs

are concerned that the materials might contain substantive errors. However, extending the temporary restraining order to allow for an investigation into the contents of these materials would transform plaintiffs' challenge to AB 441 into an "as applied" challenge to AB 441, a process the *Casey* litigation warns against. It is possible that the Department of Health and Social Services might make mistakes when it produces these materials, but at this stage, plaintiffs have not provided any evidence that the risk of error is so likely that AB 441 should not go into effect until the materials are checked for accuracy.

Last, it is necessary to address briefly a procedural objection that is raised by defendants. They argue that plaintiffs waived their right to address any issue relating to the state materials because plaintiffs did not raise the issue at the hearing where the extension of the temporary restraining order was agreed upon. Defendants are correct in their claim that the order entered on June 20, 1997, said nothing about the state materials. But the defendants are not correct in their claim that the state materials were not discussed at the hearing. They were discussed. A month later, plaintiffs signaled once more that they were concerned about the state materials when they filed their initial brief. If defendants were confused about the scope of the matters before the court, this brief should have alerted them that plaintiffs wanted to address the state materials. If defendants believed that the state materials were not encompassed by the order entered after the hearing, they should have filed a motion seeking clarification immediately; defendants have no justification for waiting more than a month longer to raise the issue in a brief. Finally, because plaintiffs raised the state materials issue in the beginning, defendants have had a complete opportunity to be heard on it and have not been prejudiced by this court's consideration of the issue.

ORDER

IT IS ORDERED that

1. The opinion and order entered on June 19, 1997, is modified as follows: the provi-

sions of AB 441 requiring distribution of county lists are constitutional only when interpreted to mean that (a) the county in which a "qualified physician" under Wis. Stat. § 253.10(2)(g) is located is not obligated to distribute the list to that qualified physician, unless that physician is also "the physician who is to perform or induce the abortion" under Wis. Stat. § 253.10(3)(c)1; (b) no physician, whether a "qualified physician" under § 253.10(2)(g) or "the physician who is to perform or induce the abortion" under § 253.10(3)(c)1, is required to go to any effort to obtain the county's list; and (c) the only duty that AB 441 places on a "qualified physician" under § 253.10(2)(g) or "the physician who is to perform or induce the abortion" under § 253.10(3)(c)1, is to distribute, upon request, whatever list has been distributed to the facility, clinic or hospital where the physician practices and in which the physician is meeting with the woman considering whether to have an abortion;

2. Plaintiffs' motion to maintain the temporary restraining order in effect until the state has prepared the state materials specified under Wis. Stat. § 253.10(3)(d) and they are available for distribution is GRANTED; the temporary restraining order shall remain in effect until defendants have advised the court and plaintiffs in writing that the materials are available for distribution and have moved for a lifting of the temporary restraining order; and

3. Plaintiffs' motion to maintain the temporary restraining order in effect until they have had a chance to review the state materials specified under Wis. Stat. § 253.10(3)(d) is DENIED.